COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-381-CV

JAMES R. DUNNAGAN AND APPELLANTS

PARKER COUNTY’S SQUAW AND APPELLEES

CREEK DOWNS, L.P. 

V.

JOSEPH EARL WATSON APPELLEE

AND APPELLANT

------------

FROM THE 43RD DISTRICT COURT OF PARKER COUNTY

------------

OPINION

------------

I.  Introduction

This appeal concerns a dispute between Appellant and Cross-Appellee James R. Dunnagan (“Dunnagan”)
(footnote: 1) and Appellee and Cross-Appellant Joseph Earl Watson (“Watson”), two members of a limited partnership who sued each other after repeated disagreements ensuing from activities associated with the limited partnership.  After a trial, a jury found that Watson breached fiduciary duties that he owed to the limited partnership and that it was not practicable for the limited partnership to continue.  In four issues, Dunnagan, as appellant, complains that the trial court abused its discretion by refusing to strike Watson’s second amended petition, that the trial court erred by denying his motion to disregard jury findings and to reform judgment, that the evidence is legally and factually insufficient to support the jury’s finding that Dunnagan’s actions rendered it not practicable for the limited partnership to continue, and that the trial court abused its discretion by denying his motion for new trial.  In two issues, Watson, as cross-appellant, challenges the legal and factual sufficiency of the evidence to support the jury’s finding that he breached fiduciary duties owed to the limited partnership and the trial court’s judgment awarding damages to the limited partnership.  We affirm the trial court’s judgment in all respects.

II.  Factual and Procedural Background

On September 22, 1997, Dunnagan, Watson, and Larry Lawley (“Lawley”) entered into a limited partnership agreement for the purpose of  acquiring, holding, managing, and operating the former Trinity Meadows horse racing facility in Willow Park, Parker County, which Dunnagan, Lawley, and two other investors had purchased while the facility was in bankruptcy.  The name of the limited partnership was “Parker County’s Squaw Creek Downs, L.P.” (“the limited partnership”).  At the time of the limited partnership’s inception, Dunnagan owned forty-nine percent of the limited partnership and Watson and Lawley each owned twenty-four and one-half percent of the limited partnership.  All were limited partners.

Dunnagan, Watson, and Lawley also formed Parker County III, Inc. (“PC III”), a Texas corporation that owned the remaining two percent of the limited partnership and served as its general partner.  Dunnagan owned fifty percent and Watson and Lawley each owned twenty-five percent of PC III.  Watson served as the president, Lawley as the vice-president, and Dunnagan as the secretary/treasurer of PC III.

The limited partnership applied for a Class 2 horse racetrack license with the Texas Racing Commission in February 1998.  A few months later, while the application for the license was pending, Lawley, along with Watson’s support, suggested that the limited partnership open a restaurant at the facility in an effort to gain support from the horsemen—the individuals who used the facility to train their horses—and to demonstrate to the public that the facility was occupied and no longer the former Trinity Meadows operation.  Watson opined that the limited partnership would be granted a racing license “soon” and that the restaurant would help jump start the patronage.  Dunnagan, however, was opposed to opening the restaurant because he did not think that it would be profitable.  Instead, he wanted to focus on obtaining a racing license.  Tom Keating, the general manager and CPA of the limited partnership from October 1997 to May 1999, projected that the restaurant would not be profitable without a racing license.

Despite Dunnagan’s objections and concerns, the limited partners reached an agreement regarding opening the restaurant.  The minutes from a board meeting held on June 24, 1998 state,

The fourth item on the agenda was the restaurant.  Joel Watson and Larry Lawley agreed to be responsible for all the expenses of the restaurant and with that agreement Jim Dunnagan did not have any objection to moving forward with it opening as soon as possible.  Larry and Joel will also be entitled to all of the profits from the restaurant if any between now and when the track opens.  It is agreed between the partners that once simulcasting begins the partners will all own and split the proceeds and/or losses in the restaurant equally.

Thus, Watson and Lawley assumed responsibility for all expenses associated with the restaurant until the racing license was obtained.  

The restaurant opened in July 1998 and was initially managed by Lawley and Watson’s parents, Sherry and Larry Watson.
(footnote: 2)  At some point thereafter, however, Lawley no longer participated in the actual operation of the restaurant, leaving Sherry and Larry Watson with the responsibility.  The restaurant’s utility bills were in the name of the limited partnership.  The limited partnership never operated the restaurant.

The limited partnership operated the facility’s “backside” in 1997 and 1998.
(footnote: 3)  Although unprofitable, it was the only income generated by the limited partnership during this time.  According to Dunnagan and Keating, Watson, Lawley, and Weldon Kennedy, Watson’s grandfather, assumed the responsibility of operating the backside in January 1999.  Similar to their agreement with Dunnagan regarding the restaurant, Watson and Lawley agreed to operate the backside at their own risk, assuming all of the losses and profits until the racing license was acquired.  Watson testified that he and Lawley did not assume control and operation of the backside until December 1999.

In March 1999, the Racing Commission denied the limited partnership’s application for a racing license.  For the most part, it was at this point that the disagreements between the limited partners over various issues associated with the limited partnership began.  Dunnagan indicated that he would no longer make any contributions to the limited partnership.  He also wanted to close the backside because it was losing money.  Watson and Lawley, however, voted to keep the backside open, as indicated by the minutes from a board meeting held on October 7, 1999, and continued to operate it under the same understanding regarding expenses and profits.  The Watsons also continued to operate the restaurant after the racing license was denied in order to continue building “good faith” with the patrons and horsemen, to be up and running once the racing license was granted following a successful appeal of the initial decision denying the license, and to occupy the facility for insurance purposes. Dunnegan testified that he did not believe that the limited partnership was being treated fairly and that he expected the Watsons to pay rent to the limited partnership if they continued to operate the restaurant and backside after the racing license was denied.  Watson did not recall Dunnagan suggesting that the facilities should be leased.  The Watsons operated the restaurant and backside until November 1, 2002.  PC III assumed possession, operation, and control of the backside on November 1, 2002, pursuant to an order entered by the trial court modifying a mutual temporary injunction initially entered into on June 25, 2001.
(footnote: 4)
 Dunnagan and Watson also became involved in a dispute over Lawley’s interests in the limited partnership and shares in PC III.  Dunnagan had offered to purchase all of Watson’s and Lawley’s shares in PC III and interests in the limited partnership, but Watson objected and contended that the limited partnership agreement and the shareholders agreement required Lawley to offer his interests in PC III to him first.  Kennedy also obtained an injunction enjoining Dunnagan from purchasing Watson’s and Lawley’s shares and interests.  Lawley therefore offered to sell his interests in the limited partnership and PC III to Watson, who accepted.  Watson ultimately made only two of the three required payments under his agreement with Lawley, and Dunnagan purchased Lawley’s remaining shares of stock and interest in the limited partnership. Thereafter, Lawley owned no interest in the limited partnership and zero shares in PC III.

Watson sued Dunnagan and Lawley in June 2001.  He sought injunctive relief to maintain the status quo of the limited partnership, a declaratory judgment to determine the ownership of Lawley’s shares and limited partnership interest, and damages for breach of fiduciary duties.  Dunnagan filed a third-party petition against Watson, alleging that Watson breached fiduciary duties.

At a meeting of the PC III board of directors on January 30, 2003, Watson was voted out as president and Lawley was voted out as vice-president of PC III.  Dunnagan was elected as president and secretary of PC III.

Dunnagan and Watson went to trial in February 2003.
(footnote: 5)  The jury found that Dunnagan did not breach any fiduciary duties owed to the limited partnership, that Watson did breach fiduciary duties owed to the limited partnership, that Watson’s breach of fiduciary duties caused the limited partnership damages in an amount of $459,645.69, that Watson loaned $0 to the limited partnership to pay its debts, and that it would not be practicable for the limited partnership to continue.  The jury also determined the total capital contributions made by Dunnagan and Watson and the account balance of their respective capital contributions.

The trial court entered judgment on the verdict, which, among other things, ordered that the limited partnership be dissolved.  Dunnagan subsequently moved to disregard the jury’s answer to question number eight (judicial dissolution) and to reform the judgment.  In the alternative, Dunnagan moved for a new trial.  The trial court denied the motion.  Both parties appealed.

III.  Watson’s Second Amended Petition

In his first issue, Dunnagan argues that the trial court abused its discretion by refusing to strike Watson’s second amended petition, which was filed seven days before the February 17, 2003 trial setting and added a new cause of action for judicial dissolution of the limited partnership.  He argues that Watson’s second amended petition was prejudicial on its face because it asserted a new cause of action and that the amendment surprised him.  Watson responds that his cause of action for judicial dissolution of the limited partnership was not a fundamental or wholesale change in the nature of the lawsuit and that events preceding the trial warranted the inclusion of the additional claim.

Rule 63 of the Texas Rules of Civil Procedure governs pleading amendments.  
Tex. R. Civ. P.
 63.  A party may amend its pleadings at any time unless the amendment will operate as a surprise; however,
 any pleadings offered for filing within seven days of trial shall be filed only after leave of court is obtained.  
Id
.  

The trial court has no discretion to refuse an amendment unless the opposing party presents evidence of surprise or prejudice or the amendment is prejudicial on its face because, for example, it asserts a new cause of action or defense.  
Greenhalgh v. Serv. Lloyd’s Ins. Co.
, 787 S.W.2d 938, 939 (Tex. 1990); 
Hardin v. Hardin
, 597 S.W.2d 347, 349-50 (Tex. 1980).  However, merely because an amended pleading asserts a new cause of action does not make it prejudicial to the opposing party as a matter of law.  
Smith Detective Agency & Nightwatch Serv., Inc.
 
v. Stanley Smith Sec., Inc.
, 938 S.W.2d 743, 749 (Tex. App.—Dallas 1996, writ denied).  Accordingly, an amendment is prejudicial on its face if (1) it asserts a new substantive matter that reshapes the nature of the trial itself, (2) the opposing party could not have anticipated the amendment in light of the prior development of the case, and (3) the opposing party’s presentation of the case would be detrimentally affected.  
Id
.; 
see also Rusk v. Rusk
, 5 S.W.3d 299, 309 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).  The burden of showing surprise or prejudice is on the party resisting the amendment.  
Hardin
, 597 S.W.2d at 349.

We review the trial court’s ruling allowing an amended pleading for an abuse of discretion.  
Id
. at 349-50.  A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles.  
K-Mart Corp. v. Honeycutt
, 24 S.W.3d 357, 360 (Tex. 2000).

Here, Dunnagan’s sole argument that Watson’s second amended petition was prejudicial on its face is only that it asserted a new cause of action for judicial dissolution.  Because an amended pleading that asserts a new cause of action does not, as a matter of law, make it prejudicial to the opposing party, Dunnagan’s argument that the amendment was prejudicial on its face merely because it asserted a new cause of action is unpersuasive.  
See Stanley Smith Sec., Inc.
, 938 S.W.2d at 749.

Nonetheless, he does not argue that he could not have anticipated the amendment in light of the prior development of the case or that his case was detrimentally affected, two of the three factors used to determine if an amendment is prejudicial on its face.  
See id.
  Dunnagan does, however, state that “Watson’s amendment clearly reshaped his causes of action.”  But Section 8.02 of the Texas Revised Limited Partnership Act provides that a court may dissolve a limited partnership if it “determines that another partner has engaged in conduct relating to the limited partnership business that makes it not reasonably practicable to carry on the business in limited partnership with that partner.”  
Tex. Rev. Civ. Stat. Ann. art. 
6132a-1
, § 8.02(2) (
Vernon Supp. 2006
).
  Watson’s other primary claim was breach of fiduciary duty, a cause of action also focusing on the conduct of one or more individuals within the context of some business entity.  The evidence submitted in support of both causes is thus not mutually exclusive and overlaps to some extent.  Without further explanation by Dunnagan, it is not “clear” how the amendment “reshaped” Watson’s case to the extent that it was prejudicial on its face.  

Citing five factors applied by one of our sister courts to determine whether there has been a showing of surprise resulting from a pleading amendment, Dunnagan further argues that he established that he was surprised by the amendment.  Dunnagan lists these factors as including (1) how long the suit had been on file before the amendment was filed, (2) how soon before trial the amendment was made, (3) whether the amendment presented a new claim or cause of action, (4) whether the new cause of action was based on recently discovered matters, and (5) whether the resisting party alleged surprise and that he was not prepared to try the new cause of action
.  
See Stevenson v. Koutzarov
, 795 S.W.2d 313, 321 (Tex. App.—Houston [1st Dist.] 1990, writ denied)(op. on reh’g).

The third and fifth 
factors are dispositive to our analysis and demonstrate how 
Stevenson 
is distinguishable from this case.  In 
Stevenson
, the amendments to the petitions introduced five new causes of action and increased liability from an estimated $30,000 to over $16.5 million.  
Id
.  Emphasizing the third factor, the court held that the trial court abused its discretion by denying the resisting party’s motion to strike the pleadings because the amendments constituted a “wholesale revision” of the suit.  
Id
. 
Here, Watson’s amendment ultimately added a single cause of action and did not seek any additional monetary damages.  Considering this and the entire record, we cannot say that the additional cause of action constituted a “wholesale revision” of the suit.  And, as discussed above, without any explanation to the contrary, the fact that Watson’s amended pleading set forth a new cause of action for judicial dissolution is not in and of itself fatal to the amendment.

Under the fifth 
Stevenson 
factor, we are to consider not only if the resisting party alleged surprise, but 
also 
if the resisting party alleged that he was not prepared to try the new cause of action.  
See id
.  Dunnagan alleged that he was surprised in his motion to strike Watson’s second amended petition because the facts upon which Watson based his claim for dissolution had been in existence for at least three years and because much discovery had been conducted in the absence of the claim.  But Dunnagan did not assert in his motion to strike and he does not argue on appeal that he was not prepared to try the dissolution claim—what is probably the primary underlying rationale for denying an amended pleading on the eve of trial.  As Watson points out, the entire lawsuit was based on Dunnagan’s and Watson’s individual actions and behavior as limited partners and was explored at great length over the course of discovery.  The trial court thus had a non-arbitrary and reasonable basis for its ruling.  Accordingly, we hold that the trial court did not abuse its discretion by denying Dunnagan’s motion to strike Watson’s second amended petition on the grounds of prejudice or surprise.  
See Honeycutt
, 24 S.W.3d at 360.  We overrule Dunnagan’s first issue.

IV.  Motion to Disregard Jury Findings and to Reform Judgment

In his second issue, Dunnagan argues that the trial court erred by denying his motion to disregard the jury’s answer to question number eight and his motion to reform the judgment.  Question number eight asked the jury whether Dunnagan’s actions rendered it not practicable for the limited partnership to continue.  The jury answered “Yes.” 
 
Also significant to this issue is the jury’s answer to question number two, which asked the jury whether Dunnagan failed to comply with his fiduciary duties.  The jury answered “No.”  Dunnagan argues that because the conduct upon which Watson sought to dissolve the limited partnership was based solely on Dunnagan’s alleged breaches of fiduciary duty, the jury’s “No” answer to question number two conclusively negated the jury’s “Yes” answer to question number eight.  Dunnagan further argues that the jury’s answer to question number two, at the very least, rendered its answer to question number eight immaterial and that the jury’s answer to question number eight should have been disregarded because Watson had unclean hands.

A trial court may disregard a jury’s finding if there is no evidence to support the jury’s finding or if it is immaterial.  
Southeastern Pipe Line Co., Inc. v. Tichahek
, 997 S.W.2d 166, 172 (Tex. 1999); 
Alm v. Aluminum Co. of America
, 717 S.W.2d 588, 593 (Tex. 1986).  
A no evidence challenge may be sustained when the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999)
.  
Anything more than a scintilla of evidence is legally sufficient to support the finding.  
Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996); 
Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).

A.  Conclusive Negation

Watson initially argues that Dunnagan waived his right to appeal the jury’s answer to question number eight because he failed to object to the instruction before the jury was discharged and failed to submit a written request seeking different instructions.  Because Dunnagan is not complaining of the form of the instruction or arguing that a conflict exists between jury question number two and eight, we hold that Dunnagan preserved error for this issue by raising it in his motion to disregard jury findings and to reform judgment.  
See 
T.O. Stanley Boot Co. v. Bank of El Paso,
 847 S.W.2d 218, 220 (Tex. 1992) (reasoning that a no evidence challenge may be preserved through a motion to disregard the jury’s answer to a vital fact question).

Turning to the merits of the issue, Dunnagan’s argument that the jury’s answer to question number two conclusively negated its answer to question number eight rests upon an improper implication or misinterpretation stemming from the jury’s answer to question number two according to 
C. & R. Transp., Inc. v. Campbell
, 406 S.W.2d 191, 194-95 (Tex. 1966).  Under 
Campbell
, a jury’s failure to find a particular fact merely means that the proponent failed to meet its burden of proving the fact by a preponderance of the evidence.  
Id
.  It does not mean the reverse of the failed fact finding.  
Id
.  Sustaining Dunnagan’s argument and holding that the jury’s answer to question number two negated its answer to question number eight would force us to recognize that his actions in relation to the limited partnership were 
appropriate 
since the jury found that he 
did not 
breach his fiduciary duties owed to the limited partnership.  Indeed, the reasoning behind Dunnagan’s argument is evidenced in the hearing on his motion to disregard the jury finding.  There, his counsel argued that “[Watson] is the one who has done everything wrong, and a jury has found 
that Mr. Dunnagan has done it right
.” [Emphasis added]  This is a misinterpretation of the fact finding because, properly interpreted, the jury’s answer to question number two represents only a refusal by the jury to find from a preponderance of the evidence that Dunnagan breached fiduciary duties owed to the limited partnership, not that his actions were appropriate and that there is thus no basis for the jury’s answer to question number eight.  
See id
.; 
Sterner v. Marathon Oil Co.
, 767 S.W.2d 686, 690 (Tex. 1989); 
Greenwelge v. Shamrock Reconstructors, Inc.
, 705 S.W.2d 693, 694 (Tex. 1986).

We further note that although Dunnagan stresses that the conduct upon which Watson sought to dissolve the limited partnership was confined to alleged breaches of fiduciary duty by Dunnagan, jury question number eight merely asked the jury whether Dunnagan’s actions rendered it “not practicable for [the limited partnership] to continue.”  It does not impliedly or expressly condition the finding of “not practicable” on Dunnagan’s alleged breach of fiduciary duties.  We overrule Dunnagan’s second issue to the extent he argues that the jury’s answer to question number two negated its answer to question number eight.

B.  Immaterial

Dunnagan further argues that the jury’s answer to question number two rendered its answer to question number eight immaterial as a matter of law because, as above, Watson based his claim for dissolution of the limited partnership on Dunnagan’s alleged breaches of fiduciary duty.

A question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, or when it was properly submitted but has been rendered immaterial by other findings.  
Tichacek
, 997 S.W.2d at 172.  Here, the cases cited by Dunnagan as support are distinguishable or inapposite because jury question number eight had an effect on the judgment—but for the cause of action, instruction, and positive jury finding, the process of winding up the limited partnership would not have been ordered to begin through judicial dissolution.  
Compare Brown v. Hopkins
, 921 S.W.2d 306, 317 (Tex. App.—Corpus Christi 1996, no writ) (holding that jury’s finding of no negligence and no proximate cause rendered jury question regarding right of control immaterial).  Jury question number eight is not conditioned on the jury’s answer to question number two, nor is it rendered immaterial, like in 
Hopkins
, because it is part of Watson’s breach of fiduciary duty claim.  Accordingly, the jury’s answer to question number two did not render its answer to question number eight immaterial, and we overrule Dunnagan’s second issue to the extent that he makes this argument. 

C.  Unclean Hands

Dunnagan also argues that the trial court erred by denying his motion to disregard jury question number eight because Watson does not have clean hands.  
Dunnagan argues, again, that because the jury found that Watson breached fiduciary duties owed to the limited partnership, he should have been precluded from recovering on his equitable cause of action for dissolution of the limited partnership.

The clean hands doctrine requires that one who seeks equity, does equity.  
In re Francis
, 186 S.W.3d 534, 551 (Tex. 2006).  Equitable relief is not warranted when the plaintiff has engaged in unconscionable, unjust, or inequitable conduct with regard to the issue in dispute.  
Id
.; 
Crown Const. Co., Inc. v. Huddleston
, 961 S.W.2d 552, 559 (Tex. App.—San Antonio 1997, no pet.).  However, the rule is not absolute.  
Omohundro v. Matthews
, 161 Tex. 367, 384, 341 S.W.2d 401, 410 (Tex. 1960).  The clean hands doctrine should not be applied unless the party asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine.  
City of Fredericksburg v. Bopp
, 126 S.W.3d 218, 221 (Tex. App.—San Antonio 2003, no pet.).  The determination of whether a party has come to court with unclean hands is left to the discretion of the trial court.  
Francis
, 186 S.W.3d at 551.

Dunnagan has not shown what unconscionable, unjust, or inequitable conduct Watson engaged in with regard to his 
judicial dissolution 
cause of action that would cause the equitable relief to be unwarranted.  
See Huddleston
, 961 S.W.2d at 559.  The jury’s affirmative finding that Watson breached fiduciary duties is derived from a cause of action independent from Watson’s judicial dissolution claim and is merely collateral thereto.  
See Thomas v. McNair
, 882 S.W.2d 870, 881 (Tex. App.—Corpus Christi 1994, no writ). Dunnagan has also not explained how he has been or will be harmed by the judicial dissolution of the limited partnership.  
See City of Fredericksburg
, 126 S.W.3d at 221.  At trial, Dunnagan merely testified that he did not want the limited partnership to be dissolved because he wanted to operate the facility for five years and attempt to make a profit.  This is not harm.  And Dunnagan has not shown how the wrong complained of, assuming from his argument that it was Watson’s breach of fiduciary duty, could not be corrected without application of the unclean hands doctrine.  
Id
.  The jury found that Watson breached fiduciary duties owed to the limited partnership and assessed damages to the limited partnership at $459,645.69.  The limited partnership having been compensated for its damages, it is unclear what injustice Dunnagan seeks to prevent or remedy through application of the unclean hands doctrine 
vis-a-vis
 Watson’s judicial dissolution claim.  For these and the above reasons, we overrule Dunnagan’s second issue.

V.  Sufficiency of the Evidence—Judicial Dissolution

In his third issue, Dunnagan argues that the trial court erred by denying his motion to disregard jury findings and to reform judgment and his motion for new trial because the evidence is legally and factually insufficient to support the jury’s answer finding to question number eight that his actions rendered it not practicable for the limited partnership to continue.  Watson responds that the evidence is legally and factually sufficient to support the jury’s answer to question number eight.

A.  Standards Of Review

A legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.  
Martinez
, 977 S.W.2d at
 334.  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.
  
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005).  When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.  
Kindred v. Con/Chem, Inc.
, 650 S.W.2d 61, 63 (Tex. 1983).

In contrast, an assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.  
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406-07 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).
  The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.  
Golden Eagle Archery, Inc. v. Jackson
, 116 S.W.3d 757, 761 (Tex. 2003).

B.  Not “Practicable” For The Limited Partnership To Continue

Section 8.02(2) of the Texas Revised Limited Partnership Act provides that a court may decree dissolution of a limited partnership if it is determined that “another partner has engaged in conduct relating to the limited partnership business that makes it not reasonably practicable to carry on the business in limited partnership with that partner.”  
Tex. Rev. Civ. Stat. Ann.
 art. 6132a—1, § 8.02(2).  Jury question number eight tracked most of the language of the statute and asked, “Do you find that the actions of James R. Dunnagan rendered it not practicable for [the limited partnership] to continue?”  Thus, our sufficiency examination will be guided largely by our interpretation of the phrase, “not practicable for [the limited partnership] to continue,” which we consider in light of Dunnagan’s “actions.”  

Watson cites American Jurisprudence Second to show what type of conduct may justify dissolution under the practicability standard, and Dunnagan focuses on the language of the statute itself.  Our primary objective, however, when construing a statute is to give effect to the legislature’s intent.  
Tex. Dep’t of Transp. v. Needham
, 82 S.W.3d 314, 318 (Tex. 2002).  We first look to the statute’s plain and common meaning; if the statutory language is unambiguous, we will interpret the statute according to its plain meaning.  
Id
.  “[E]very word in a statute is presumed to have been used for a purpose; and a cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible.”  
Tex. Workers’ Comp. Ins. Fund v. Del Indus., Inc
. 35 S.W.3d 591, 593 (Tex. 2000).  Construction of a statute that would make a provision useless is not favored by law.  
Conseco Fin. Servicing Corp. v. J & J Mobile Homes, Inc.
, 120 S.W.3d 878, 884 (Tex. App.—Fort Worth 2003, pet. denied).

Here, Section 8.02(2) is unambiguous, and the legislature’s intent is clear; we therefore apply its plain and ordinary meaning, which is the interpretation advocated by Watson.

The record demonstrates that Dunnagan refused to make any more capital contributions to the limited partnership after the racing license had been denied and that at one point he broke through the ceiling of the accountant’s office and removed computer hardware containing financial information.  Dunnagan was opposed to opening the restaurant because he did not think that it would be profitable, and he wanted to close the backside because it was losing money.  The minutes from the meeting held on October 7, 1999 state that “the partners agreed there was a major disagreement on the future operation of the track.”  Watson and Lawley nonetheless agreed to operate the restaurant and backside contrary to Dunnagan’s wishes, and Dunnagan did not want to have anything to do with the operation of the restaurant and backside while they were under Watson’s control.  After the racing license had been denied, Dunnegan did not think that the limited partnership was being treated fairly.  He expected the Watsons to pay rent to the limited partnership if they continued to operate the restaurant and backside after the racing license was denied, which they never did.  Dunnagan and Watson were also involved in a dispute over Lawley’s interests in the limited partnership and shares in PC III.  Dunnagan subsequently voted Watson out as president and Lawley out as vice-president of PC III and was elected as president and secretary of PC III. Dunnagan now owns 59.7% of the limited partnership and 61% of the shares in PC III, which is a controlling interest in both the limited partnership and PC III.  And as described more thoroughly below, Dunnagan testified about the state of disrepair that parts of the facility were in while under Watson’s control, which he has tried to remedy. 
 Dunnagan even testified that he did not think that he could work with Watson and manage the facility together.

Under the plain and ordinary meaning of Section 8.02(2), the above evidence constitutes “actions” by Dunnagan demonstrating that it is no longer “practicable” for the limited partnership to continue.  Dunnagan’s argument that he is the lawful owner of a majority interest in both the limited partnership and PC III and that Watson would no longer be participating in the management of the limited partnership, although well taken, advocates an interpretation of Section 8.02(2) that avoids the statute’s plain and ordinary meaning and renders it virtually useless.  
The evidence detailed above shows how the ends of the limited partnership have been frustrated not only by the failure of the limited partnership to obtain a racing license and operate a horse racing track, which was the “purpose” of the limited partnership, but by the seemingly endless disagreements and discontent between Dunnagan and Watson.  Accordingly, viewing the evidence favorable to the jury’s finding and disregarding the evidence and inferences contrary thereto, we hold that the evidence is legally sufficient to support the jury’s finding that the actions of Dunnagan rendered it not practicable for the limited partnership to continue.
  See City of Keller
, 
168 S.W.3d at 827;
 
Martinez
, 977 S.W.2d at
 334.  
Moreover, considering all of the evidence, the
 
evidence supporting the same finding is not so weak or the evidence to the contrary is not so overwhelming that the jury’s answer should be set aside and a new trial ordered.  
Garza
, 395 S.W.2d at 823.  The evidence is thus also factually sufficient to support the jury’s answer to jury question number eight.  
See Ellis County State Bank v. Keever
, 888 S.W.2d 790, 794 (Tex. 1994) (stating that court of appeals need not detail supporting evidence when upholding the factual sufficiency of the evidence underlying the trial court’s judgment).  We overrule Dunnagan’s third issue.

Dunnagan argues in his fourth issue that the trial court abused its discretion by denying his motion for new trial, which he filed along with his motion to disregard jury findings and to reform judgment.  He set forth the same grounds in each motion and incorporated his arguments on appeal into his complaint regarding the trial court’s denial of his motion for new trial.  For the same reasons articulated above, we hold that the trial court did not abuse its discretion by denying Dunnagan’s motion for new trial.  
See Cliff v. Huggins
, 724 S.W.2d 778, 778 (Tex. 1987) (stating that trial court’s decision on a motion for new trial is reviewed for an abuse of discretion).  We overrule Dunnagan’s fourth issue.

VI.  Sufficiency of the Evidence—Breach of Fiduciary Duties and Damages

In his first cross-issue, Watson argues that the evidence is legally and factually insufficient to support the jury’s finding that he failed to comply with his fiduciary duties owed to the limited partnership (jury question number one). In his second cross-issue, Watson argues that the evidence is legally and factually insufficient to support the jury’s finding assessing damages to the limited partnership for Watson’s breach of fiduciary duties in the amount of $459,645.69 (jury question number three).  We apply the same legal and factual sufficiency standards of review articulated above.  
See 
City of Keller
, 
168 S.W.3d at 827; 
Martinez
, 977 S.W.2d at
 334; 
Mar. Overseas Corp.
, 971 S.W.2d at 406-07; 
Kindred
, 650 S.W.2d at 63; 
Garza
, 395 S.W.2d at 823.

A.  Preservation Of Error

Before examining the sufficiency of the evidence to support the jury’s answers to question numbers one and three, we address Dunnagan’s argument that Watson waived his legal and factual sufficiency challenges to question number three and his factual sufficiency challenge to question number one by failing to preserve error.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.  
Tex. R. App. P.
 33.1(a); 
see also
 
Tex. R. Evid.
 103(a)(1).  
In a jury trial, legal sufficiency issues or points must be preserved through one of the following procedural steps in the trial court: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial.  
T.O. Stanley Boot Co., Inc., 
847 S.W.2d at 220; 
Salinas v. Fort Worth Cab & Baggage Co.
, 725 S.W.2d 701, 704 (Tex. 1987).  
See generally
 William Powers, Jr. & Jack Ratliff, 
Another Look at "No Evidence" and "Insufficient Evidence,"
 69
 Tex. L. Rev
. 515, 530 (1991).  With a few exceptions not applicable here, 
a complaint of factual insufficiency of the evidence to support a jury answer must have been raised in a motion for new trial.  
See 
Tex. R. Civ. P. 
324(b)(2).

Here, Watson, acting pro se at the time, filed his “Response and Counter Motions to Motion to Disregard Jury Findings, to Reform Judgment, and in the Alternative Motion for new Trial,” which included a motion for new trial. Therein, Watson stated,

Watson objects to the Judgment because the Judgement is void.  Further, the Judgment is erroneous, and/or was wrongfully interpreted given the weight of the evidence presented and the law applicable to such evidence rendering a verdict which was not factually supported by the evidence and/or is legally insufficient . . . . 

Specifically, as to damages, Watson argued,

Watson objects to Paragraph 6 [of the judgment, which set forth damages] because the damages arrived at and deemed due and owing by Watson is erroneous, failed to take into account all of the liabilities of the Partnership or the fair market value less encumbrances, defects, physical circumstances and obsolescence, deferred maintenance and other charges and costs properly attributable in diminution of damages, if any.

Because Watson specifically objected to the jury’s damages award in his motion for new trial, Watson preserved his legal and factual sufficiency arguments for appeal.  
See 
Tex. R. App. P.
 33.1(a)
; 
Tex. R. Civ. P. 
324(b)(2)
; 
T.O. Stanley Boot Co.,
 
Inc.
, 847 S.W.2d at 220.  The same cannot be said for his sufficiency argument regarding the jury’s finding that he breached fiduciary duties, however.  Watson did not specifically object to the jury’s finding that he breached fiduciary duties owed to the limited partnership in his motion for new trial.  Consequently, he did not preserve for appellate review his factual sufficiency challenge to jury question number one.  
See 
Tex. R. App. P.
 33.1(a)(1)(A);
 Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.
, 927 S.W.2d 146, 150-51(Tex. App.—Corpus Christi 1996, no writ) (“In order to preserve an insufficient evidence point for review, the motion for new trial must specifically point out the deficiencies in a manner that adequately apprises the trial judge of those deficiencies.”)
(footnote: 6)
B.  Breach Of Fiduciary Duties

Fiduciary duties arise as a matter of law in certain formal relationships, including the relationships between partners.  
Ins. Co. of N. Am. v. Morris
, 981 S.W.2d 667, 674 (Tex. 1998).  The term “fiduciary” generally applies “to any person who occupies a position of peculiar confidence towards another,“ refers to “integrity and fidelity,” and contemplates “fair dealing and good faith.”  
Daniel v. Falcon Interest Realty Corp.
, 190 S.W.3d 177, 185 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

In his second amended answer and third party petition, Dunnagan alleged that Watson owed to the limited partnership and PC III the obligation of good faith and fair dealing, an obligation not to usurp corporate opportunities, and the obligation to seek the approval of the board of directors before entering into certain agreements or incurring indebtedness on behalf of the corporation and limited partnership.  Dunnagan alleged that Watson’s breach of fiduciary duties caused him damages by depriving him of his right to obtain a reasonable lease payment from Watson’s conducting of the restaurant and lease and by incurring debt in the name of PC III.

The trial court’s charge to the jury defined a fiduciary relationship as a “relationship of trust and confidence” and instructed the jury that a fiduciary relationship exists between a corporate officer or director and the corporation.  The trial court instructed the jury that the fiduciary duty of an officer or director includes the duty to exercise care in the management of corporate affairs and that in determining compliance with the fiduciary duties, the jury could consider whether the transaction was fair and equitable to the limited partnership, whether the officer or director acted in the utmost good faith and exercised the most scrupulous honesty toward the limited partnership, whether the officer or director placed his interests before the limited partnership’s interest, whether the officer or director used his position to gain any benefit for himself at the expense of the limited partnership, and whether the officer or director placed himself in a position where his self-interest might conflict with his obligations as a fiduciary.

The evidence demonstrates that the limited partnership had no income producing activity after May 1999 and that
 the limited partners had agreed that the limited partnership would not be responsible for any expenses associated with the restaurant and backside.  But Watson, along with his parents, incurred debt thereafter in the name of the limited partnership through their operation of the restaurant and backside.  Specifically, Watson and his parents incurred debt in the name of the limited partnership through their utilization of the services of Duncan Disposal, Weatherford Security, Clear Fork Materials, a Sentrol security system, and the telephone and 
water services.  Sherry Watson also leased pool tables, a television satellite, and two dishwashers in the name of the limited partnership.  Watson explained that services were kept in the name of the limited partnership because the restaurant and backside would be absorbed into the limited partnership once a license was obtained.  But the limited partnership never obtained the racing license.  Watson testified that he did not expect the limited partnership to be responsible for the debts to Duncan Disposal, Weatherford Security, and Clear Fork Materials.

The record further demonstrates that it was thought that the licensing process would take anywhere from 90 days to six months and that Watson’s and Lawley’s running of the restaurant and backside was to be for a “limited period of time.”  Dunnagan testified that he had a problem with the Watsons not paying rent to the limited partnership for their continued use of the restaurant and backside after the racing license had been denied because they were not part of the limited partnership.  Dunnagan therefore asked the Watsons to pay rent for their use of the facility, which lasted for at least three years.  He testified that the following exchange took place somewhere around March 1999: “I thought that after the license was denied if they [the Watsons] were going to come in here and operate it they should be paying rent for it.  I asked her [Sherry Watson], I said, ‘Why don’t you pay rent?’  And she says, ‘We own this place.’”

Viewing the evidence favorable to the jury’s finding and disregarding the evidence and inferences contrary thereto, we hold that the evidence is legally sufficient to support the jury’s finding that Watson breached fiduciary duties owed to the limited partnership, particularly Watson’s duty to ensure that his operation of the restaurant and backside was fair and equitable to the limited partnership and that he not place his interests therein before those of the limited partnership
.  
See City of Keller
, 
168 S.W.3d at 827;
 
Martinez
, 977 S.W.2d at
 334
.  We overrule Watson’s first cross-issue.

C.  Damages

The jury has discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for the jury’s calculation.  
Swank v. Sverdlin
, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).  A jury may not, however, arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial.  
First State Bank v. Keilman
, 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied)
(op. on reh’g)
.

As discussed above, the record demonstrates that Watson, along with his parents, incurred debt in the name of the limited partnership through their operation of the restaurant and backside.  The jury heard testimony regarding a $52,800 outstanding electricity bill and a $24,662.32 debt for security services.  The jury also heard evidence that there existed an outstanding water bill for $209,000 owed to the City of Willow Park, of which the limited partnership was responsible for $46,000.

There is evidence that Watson failed to maintain the facility.  Dunnagan explained how the sand traps in each of the stable buildings were clogged and that some of the horsemen knocked holes in the walls to help water drain more quickly.  He testified that Watson had let pipes freeze on the fourth floor and that they burst and flooded portions of the facility.  Dunnagan also testified that one of the buildings on the property was burned down, that it was not insured, and that its value was between $750,000 and one million dollars.  The surface of the racing track and the railing surrounding it was also left in a state of disrepair, according to Dunnagan.  He testified that the grandstand had incurred damages of at least $25,000 and that the facility, as a whole, has incurred damages of between $250,000 to $300,000.

Regarding Dunnagan’s claim about Watson’s failure to pay rent after the racing license had been denied, Dunnagan and Jennifer Osinga, a real estate agent who was asked to valuate the restaurant and stabling facility, both testified that a fair monthly rental value for the restaurant was between $7,000 to $7,500 per month.  Osinga testified that a reasonable monthly rental value for the backside was $16,500 per month; Dunnagan testified that it was between $11,000 to $12,500 per month.
(footnote: 7)
 Thus, viewing the evidence favorable to the jury’s finding and disregarding the evidence and inferences contrary thereto, we hold that the evidence is legally sufficient to support the jury’s finding 
assessing damages to the limited partnership for Watson’s breach of fiduciary duties in the amount of $459,645.69.  
See City of Keller
, 
168 S.W.3d at 827;
 
Martinez
, 977 S.W.2d at
 334.  
Moreover, considering all of the evidence, the
 
evidence supporting the same finding is not so weak or the evidence to the contrary is not so overwhelming that the jury’s answer should be set aside and a new trial ordered.  
See Garza
, 395 S.W.2d at 823.  The evidence is thus also factually sufficient to support the jury’s answer to jury question number three.  
See Keever
, 888 S.W.2d at 794.  Accordingly, we overrule Watson’s second cross-issue.

VII.  Conclusion

Having overruled all four of Dunnagan’s issues and both of Watson’s cross-issues, we affirm the judgment of the trial court.

DIXON W. HOLMAN

JUSTICE

PANEL A:  CAYCE, C.J.; LIVINGSTON and HOLMAN, JJ.

DELIVERED:  August 24, 2006

FOOTNOTES
1:
Dunnagan’s notice of appeal and appellate brief also state that these documents are filed by him derivatively on behalf of Appellant and Cross-Appellee Parker County’s Squaw Creek Downs, L.P.  

2:
Watson was involved in a car crash at the age of fifteen.  He is confined to a wheelchair and is dependent on his parents for care.   

3:
The “backside” consists of the racetrack itself and the stabling area.  The stabling area contains almost a thousand stalls in nine or ten different barns.  Horse owners rent the stables and train their horses on the racetrack. 

4:
The temporary injunction enjoined Dunnagan and Watson from, among other things, convening any meetings of the board of directors or shareholders of PC III or convening any meetings of the limited partners of the limited partnership and committing any acts that would disrupt the ongoing business at the facility.

5:
Although numerous other parties were involved in the case in some manner prior to trial, only Watson, Dunnagan, and the limited partnership went to trial.

6:
Watson did, however, assert in an objection to the jury charge that the evidence supporting the jury’s finding that he breached fiduciary duties was legally insufficient.  Therefore, we will consider Watson’s legal sufficiency argument.

7:
The Watsons operated the restaurant and backside until November 1, 2002.