

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00475-CV

---------

TELERESOURCE CORPORATION            APPELLANT

V.

ACCOR NORTH AMERICA, INC.            APPELLEE

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## OPINION

----------

## I. INTRODUCTION

Appellant TeleResource Corporation (TRC) appeals from a partial summary judgment granted in favor of Appellee Accor North America, Inc. and a final judgment following a jury trial. In seven issues, TRC argues that the trial court erred by granting Accor summary judgment on TRC's anticipatory repudiation claim, that the evidence is legally and factually insufficient to support

some of the jury's findings, and that the trial court erred by submitting an improper jury question on Accor's damages.  We will affirm as modified.

## II. BACKGROUND

Accor is a Delaware corporation with its principal place of business in Carrollton.  Accor owns, operates, or franchises over 900 economy hotels across the United States, Canada, and Mexico under the names Motel 6 and Studio 6.

TRC is a Texas corporation with its principal place of business in Dallas.  It provides telecommunication services and support, sometimes through subcontractors, for companies in the hospitality industry.

In early April 2003, Accor and TRC signed a Master Services Agreement (MSA) in which TRC agreed to provide specific services and support for the telecommunication systems used by Accor's properties, including repairing or replacing defective telecommunication parts and components, conducting routine maintenance of the systems, and providing remote alarm monitoring.  The MSA had an initial term of forty-two months and called for two types of fees to be paid by Accor to TRC:  (1) fees for recurring services and (2) fees for nonrecurring services.  The monthly recurring-services fee was based upon a set fee per guest room and covered the support and services set out in the MSA.  Under Modification 2 to the MSA, TRC invoiced Accor sixty days in advance of the month that TRC was to perform recurring services, and Accor's payment was

2

due thirty days before TRC commenced the services.[1] The fee for nonrecurring services covered labor and materials for services that were not included in the recurring-services fee.[2] TRC invoiced Accor bimonthly for nonrecurring services, and Modification 2 required Accor to pay for the services within fourteen days of invoicing.

Modification 2 to the MSA contained the following provision regarding payment of fees:

> Material Default. *If [Accor] shall fail to provide payment in strict accordance with the dates, deadlines and obligations set forth herein the same shall be a material default.* In the event of a material default *TRC may, at its sole option, suspend provision of Services under this Agreement* until such time as the deficiency, in payment, is made without affecting the binding nature of this Agreement. Immediately upon receipt of payment in full, of such past due monies, which caused the material default, TRC may require adequate assurance of future performance by [Accor] and upon receipt of such assurance shall immediately resume provision of Services under this Agreement. [Accor] expressly agrees that any suspension of Services resulting from such Default shall not relieve [Accor] of monies due under this Agreement for the term of any such suspension. . . . *In the event that any such past due fees remain*

---

[1]The parties signed Modification 2 to the MSA in December 2003. Modification 2 contained the following illustration regarding billing for recurring services: When TRC billed Accor on January 1, 2004, Accor's payment, which was due by January 31, 2004, covered TRC's services for the month of March 2004.

The parties signed Modification 1 to the MSA soon after signing the MSA. Accor was moving its headquarters, and TRC agreed to upgrade and move Accor's telecommunication system to the new location.

[2]For example, a nonrecurring-services fee would include the cost of labor and materials for replacing damaged equipment.

*unpaid for thirty (30) days beyond the due date, a material Default shall have occurred.* [Emphasis added.]

TRC completed transitioning Accor's properties from the previous support provider in August 2003. Thereafter, the parties proceeded under the MSA and Modifications—TRC provided services and support to Accor's properties, and Accor paid TRC for those services.

With the initial term of the MSA ending in 2006, Accor invited TRC and other businesses to submit bids in March 2006 as part of a request for proposal process that Accor launched in December 2005. TRC submitted a bid, but Accor ultimately chose another business, Source, Inc., to provide the telecommunication services and support for its properties after the MSA expired. It was around that time that, according to Jorge Gonzalez, TRC's former CFO and president, "things got a little bit messy."

On August 1, 2006, TRC sent Accor an invoice for October's recurring-services fee, but Accor declined to pay it because according to the version of the MSA in its possession, the initial term of the MSA commenced on April 11, 2003, (the effective date) and expired forty-two months later in early October 2006. Thus, Accor did not want to pay for recurring services beyond the initial term of the MSA.[3] When the parties met to compare contracts, they learned that TRC

---

[3]TRC also later sent Accor an invoice for November's recurring-services fee, but Accor declined to pay it.

4

had a different version of the MSA—TRC's MSA had a handwritten effective date of June 1, 2003, meaning that the initial term of the MSA expired at the end of November 2006, not in early October 2006.

By letter dated August 23, 2006, TRC notified Accor that it would suspend service to Accor's properties effective at 5:00 p.m. that day because pursuant to section g.1.(b) of Modification 2 to the MSA, and "as a result of the failure of [Accor] to provide payment in strict accordance with the dates, deadlines and obligations set forth therein," Accor had committed a material default under the MSA. To avoid a suspension of service, TRC demanded that Accor pay the invoices detailed in a spreadsheet attached to the letter by 5:00 p.m. that day. According to the spreadsheet, the "Total Balance Outstanding" was $311,183.33. Of that amount, approximately $198,000 represented the October 2006 fee for recurring services, which was not due until August 31, 2006, according to Modification 2 to the MSA. The remaining approximately $112,000 represented invoices for nonrecurring services. Of that $112,000, only twelve invoices totaling approximately $3,400 had gone unpaid for over thirty days, and sixty-three invoices totaling approximately $23,000 had gone unpaid for at least fourteen days but less than thirty days. Thus, considering Modification 2's payment requirements for recurring and nonrecurring services, of the $311,183.33 that TRC demanded Accor pay to avoid suspended service, approximately $284,000 was not yet due.

5

TRC extended the due date for the payment that it had demanded by one day, and Accor made efforts to contact TRC's counsel and negotiate, but TRC ultimately suspended service to Accor as of 5:00 p.m. on August 24, 2006.[4]  On September 1, 2006, about a week after TRC had suspended service, TRC received Accor's payment for the twelve invoices for nonrecurring services that had gone unpaid for over thirty days and for forty-seven of the invoices for nonrecurring services that had gone unpaid for at least fourteen days, but TRC did not withdraw its suspension of service.  Accor consequently initiated an "emergency plan"—its own employees were fielding service-related calls—and it accelerated the transition period that had to occur before Source was fully capable of handling Accor's telecommunication needs.

The parties sued each other for breach of contract and other claims.  The trial court granted Accor's motion for partial summary judgment on TRC's claim for anticipatory repudiation, and a jury made a number of findings at the conclusion of a trial.  As relevant to this appeal, jury question number 2 asked,

> Did Accor fail to comply with the [MSA] and Modification 2 by failing to provide payment or continuing to fail to provide payment in strict accordance with the dates, deadlines and obligations set forth in paragraph (b), "Non-Recurring Services," in Modification 2 to the [MSA] from August 1, 2006 through August 24, 2006[?]

---

[4]Accor's counsel sent TRC a fax stating that Accor considered TRC's "suspension of service . . . to be a breach of the parties' agreement.  [TRC] demanded sums not due and payable by [Accor] and then suspended the service based on [Accor's] refusal to pay those sums, even though [Accor] was attempting to work with [TRC] on resolving the dispute."

6

The jury answered, "Yes." But jury question number 2(a) asked,

> Did [TRC] waive, through its course of conduct, strict compliance with the requirements of paragraph (b), "Non-Recurring Services," in Modification 2 to the [MSA]?

The jury answered, "Yes." Jury question number 3 asked,

> Did Accor fail to comply with the [MSA] and Modification 2 by allowing invoices to remain unpaid for at least thirty (30) days beyond the due date as set forth in paragraph (g)(1)(b), "Material Default," of Modification 2 to the [MSA]?

The jury answered, "Yes." But jury question number 3(a) asked,

> Did [TRC] waive, through its course of conduct, strict compliance with the requirements of paragraph (g)(1)(b), "Material Default," of Modification 2 to the [MSA]?

As with jury question number 2(a), the jury answered, "Yes." Jury question number 5A asked,

> Did [TRC] fail to comply with the [MSA] and Modification 2 by improperly suspending services under the [MSA] after demanding payment for invoices that were not more than thirty (30) days overdue?

The jury answered, "Yes." Jury question number 12 asked in relevant part,

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Accor for its damages, if any, that resulted from [TRC's] failure to comply with the [MSA]?

The jury answered, "$236,174.70." Jury question number 14 asked,

> What is a reasonable fee for the necessary services of Accor's attorneys, stated in dollars and cents?

7

The jury answered "$190,000" for preparation and representation in the trial court; "$25,000" for representation through an appeal to the court of appeals; and "$5,000" for representation through proceedings in the supreme court. TRC appeals.[5]

### III. PARTIAL SUMMARY JUDGMENT

In its first issue, TRC argues that the trial court erred by granting Accor summary judgment on TRC's anticipatory repudiation claim. TRC argues that it did not waive its claim, and it directs us to summary judgment evidence that Accor's general counsel told TRC on August 22, 2006, that Accor had no intention of making any further payments to TRC—"a classic repudiation of the contract."

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable

---

[5]The jury additionally found that TRC sustained damages in the amount of $86,682.20 for unpaid invoices for nonrecurring services. Thus, excluding attorneys' fees, the final judgment awarded Accor $149,492.50 ($236,174.70 less $86,682.20). Accor does not appeal that finding.

8

inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

"Under Texas law, when one party repudiates a contract, the nonrepudiating party has the right to accept the repudiation and bring a cause of action for damages immediately, or to keep the contract alive and sue for damages as they accrue." *Thomas v. Thomas*, 902 S.W.2d 621, 624 (Tex. App.—Austin 1995, writ denied); *see Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 211 (Tex. 1999). "[A] contract cannot be thus treated, for one purpose, as subsisting, and, for another purpose, as at an end. Upon such a repudiation . . . the other may make his choice between the two courses open to him, but can neither confuse them together nor take both." *Greenwall Theatrical Circuit Co. v. Markowitz*, 97 Tex. 479, 487, 79 S.W. 1069, 1071–72 (1904).

9

Here, when Accor allegedly communicated its intent to make no further payments under the MSA, TRC did not treat the MSA as terminated and sue Accor for the anticipatory breach. Instead, TRC suspended service, an option available to it under Modification 2, and sued Accor years later, after the MSA had expired. TRC argues that it did not treat the MSA as continuing in effect because it suspended service, but Modification 2 did not provide for termination of the MSA in the event that TRC suspended service. By electing to file suit after the time for performance of the MSA, TRC chose to ignore Accor's alleged anticipatory repudiation, *see Bumb v. InterComp Techs., LLC*, 64 S.W.3d 123, 125 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (reasoning similarly), and to purse a claim for breach of contract; indeed, the jury charge included no less than four different questions inquiring into whether Accor failed to comply with the MSA. *See Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 626 (Tex. App.—San Antonio 1996, writ denied) ("Since the time for performance had passed in the instant case, Samaras clearly was entitled to sue for breach of contract and to elect to have the issue submitted to the jury as an express breach or failure to comply.").

We hold that the trial court did not err by granting Accor's motion for partial summary judgment on TRC's anticipatory repudiation claim. We overrule TRC's first issue.

## IV. WAIVER FINDINGS

In its second and third issues, TRC argues that the evidence is legally and factually insufficient to support the jury's findings in question numbers 2(a) and 3(a) that TRC waived, through its course of conduct, strict compliance with Modification 2's payment deadlines.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing

11

all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).[6]

Jury question number 2(a) specifically referenced payment for nonrecurring services. And although jury question number 3(a) generally asked if TRC had waived strict compliance with the requirements of paragraph g.1.(b) of Modification 2, which appears to apply to payments for both recurring and nonrecurring services, jury question number 3 specifically asked if Accor had allowed invoices to remain unpaid for at least thirty days beyond their due date, as set forth in paragraph g.1.(b). The record reflects that at the time of the suspension of service, the only invoices that were unpaid for at least thirty days beyond their due date were for nonrecurring services. Thus, we consider in our sufficiency analysis whether TRC waived strict compliance with Modification 2's payment deadlines for nonrecurring services.

Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right. *Ulico Cas. Co. v. Allied*

---

[6]We apply these same standards of review to TRC's other arguments that challenge the legal and factual sufficiency of the evidence to support a jury finding.

12

*Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right. *Id.* TRC's argument implicates the third element.

Modification 2's section (b) required Accor to pay invoices for nonrecurring services within fourteen days of invoicing. Section g.1.(b) made it a material default if fees, including nonrecurring fees, remained unpaid for thirty days beyond the due date. These contractual provisions formed the bases for jury question numbers 2, 2(a), 3, and 3(a). But while these provisions established deadlines for making payments for nonrecurring services and for determining when a material default occurred, the record demonstrates that the parties engaged in a process for resolving disputed fees for nonrecurring services that supplanted those contractual obligations.

Jessie Burgess, Accor's Senior Director of IT telecommunication, testified that early in their relationship, the parties experienced difficulty timely invoicing, reviewing, and paying fees for nonrecurring services. Anthony D'Amico, TRC's president and CEO, testified similarly—that there were some issues getting invoices for nonrecurring services approved and paid. Eventually, the parties worked out a "dispute resolution process." Under this procedure, Accor would receive a batch of electronic invoices from TRC twice a month. Accor would then

13

review each invoice for correctness and either pay it as a capital expenditure, identify it as disputed, or submit it to accounts payable. According to TRC, the parties met every week to resolve the disputed invoices; sometimes Accor would pay the invoice, and other times invoices would be reduced or eliminated.

Significantly, regarding the length of time that it took an invoice to go through the dispute resolution process, Mark Boggess, a data analyst at Accor who worked on the nonrecurring-services invoices, opined that the whole process took anywhere from two weeks to thirty days. Burgess similarly described the process as a "30-day processing cycle." Timothy Grossenbacher, TRC's COO at the time of the suspension of service, testified that it could take up to forty-five days to work out a disputed invoice. D'Amico testified that the dispute resolution process was not a "rubber-stamp process" and that there were a few delays in getting some of the invoices paid.

As for whether any of the overdue invoices for nonrecurring services contained on the spreadsheet attached to TRC's demand that Accor pay $311,183.33 were in the dispute resolution process, Burgess explained that the invoices "very well could have been in the dispute process, which is more than likely why they would not have been paid." Indeed, he testified, "I can tell you if it's a 30-day processing cycle and we had just received, say, a bill for August 1st and it was August 24th, then that August 1st through 15th was likely still in the system being processed."

14

The evidence thus demonstrates that, as to disputed invoices, the parties informally adopted, and operated under, a dispute resolution process that effectively supplanted Modification 2, section (b)'s requirement that Accor pay invoices for nonrecurring services within fourteen days of invoicing and section g.1.(b)'s determination that a material default occurred when nonrecurring fees remained unpaid for thirty days beyond their due date. Under the process actually implemented by the parties, and contrary to Modification 2's fourteen- and thirty-day deadlines, disputed invoices were received, reviewed, and paid or not paid over a period of time that took anywhere from two weeks to forty-five days.

Notwithstanding this evidence, TRC argues that the evidence is insufficient to support the jury's findings because "[n]o witness testified that the overdue invoices . . . remained unpaid because those invoices were in the dispute process." Instead, "[t]he best Accor's witness could muster was a guess that the unpaid invoices 'could have been in the dispute process.'" We disagree with TRC's assessment of the record. The jury could have relied upon the circumstantial evidence detailed immediately above to conclude that the unpaid invoices contained on the spreadsheet attached to TRC's demand letter were in the dispute resolution process. *See Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001) (stating that circumstantial evidence may be used to establish a material fact). Moreover, Burgess unequivocally testified that Accor did not

15

arbitrarily make the decision to pay or not pay an invoice; rather, "[i]t would be because it was disputed why it would not be paid."

TRC additionally contends that it did not waive its rights, but instead exercised them, because after demanding, and failing to receive, payment from Accor, TRC suspended service to Accor's properties—conduct that was "entirely consistent with its rights under the contract." TRC certainly demanded payment from Accor and suspended service to Accor's properties in August 2006, but we cannot ignore the evidence demonstrating that throughout much of the initial term of the MSA, TRC intentionally engaged in conduct that was inconsistent with its rights under sections (b) and g.1.(b) of Modification 2 to the MSA. *See Ulico Cas. Co.*, 262 S.W.3d at 778. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's findings that TRC waived, through its course of conduct, strict compliance with Modification 2's payment deadlines. We overrule TRC's second and third issues.

## V. TRC's Breach

In its fourth issue, TRC argues that the evidence is legally and factually insufficient to support the jury's finding that TRC breached the MSA by "improperly suspending services . . . after demanding payment for invoices that were not more than thirty (30) days overdue." TRC contends that it not only had the right to declare a material default because "past due fees remain[ed] unpaid for thirty (30) days beyond the due date" (referencing the final part of

16

section g.1.(b) of the MSA), but that it also had the right to declare a material default because Accor failed to provide payment "in strict accordance with the dates, deadlines and obligations set forth" in the MSA (referencing the first part of section g.1.(b) of the MSA). TRC acknowledges that it "may have been improper" to suspend service if the suspension was based on Accor's failure to pay invoices that were not yet due, but TRC contends that it did not do that; it asserts that it instead suspended services because "there were payments that were over thirty days overdue."

TRC's arguments ignore the effect of the jury's finding. TRC's theory at trial was that it suspended service because Accor committed a material default under two different parts of section g.1.(b) of Modification 2—the part that required Accor to "provide payment in strict accordance with the dates, deadlines and obligations set forth" in the MSA and the part that made it a material default when "past due fees remain[ed] unpaid for thirty (30) days beyond the due date." But Accor's theory at trial was that TRC suspended service because Accor refused to pay for invoices that were not yet due. Thus, like in most, if not all, cases, the jury was responsible for resolving a conflict between competing theories about an ultimate fact, and it did so when it answered jury question number 5A in Accor's favor. By finding that TRC improperly suspended service after demanding payment for invoices that were *not* more than thirty days overdue, the jury impliedly rejected TRC's argument that it suspended service as

17

a result of Accor's failure to pay invoices that had remained unpaid for thirty days beyond their due date. Contrary to TRC's arguments, the mere existence of competing theories at trial does not render the evidence legally or factually insufficient, nor may we decide the issue on the mere *ipse dixit* of TRC.[7]

As mentioned above, of the $311,183.33 that TRC demanded Accor pay to avoid suspended service, approximately $284,000 was not yet due and approximately $23,000 had gone unpaid for at least fourteen, but less than thirty, days. TRC argues that there is nothing in the MSA that prohibited it from demanding payment for invoices that were not thirty days overdue, but TRC did not limit its actions to merely demanding payment of invoices that were not thirty days overdue; as the jury found, TRC took the additional step of actually suspending service after demanding payment for invoices that were not more than thirty days overdue. Modification 2 permitted TRC to suspend service in the event of a material default, but a material default did not include the reason for which TRC suspended service.

We hold that the evidence is legally and factually sufficient to support the jury's finding in question number 5A. We overrule TRC's fourth issue.

---

[7]TRC does not argue that any of the jury's findings conflict.

## VI. JURY QUESTION NUMBER 12

TRC argues in its fifth issue that the trial court erred by submitting jury question number 12, Accor's damages question, without an instruction setting forth the measure of damages.

Damages must be measured by a legal standard, and that standard must be used to guide the factfinder in determining what would compensate the injured party. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex. 1973). A jury question that fails to guide the jury on any proper legal measure of damages is fatally defective. *Id.* However, to complain on appeal about a damages question that omits an instruction on the measure of damages, the complaining party must not only object to the omission, it must also tender a written instruction in substantially correct form. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 538 n.4 (Tex. 1981); *Jim Howe Homes, Inc. v. Rogers*, 818 S.W.2d 901, 902–03 (Tex. App.—Austin 1991, no writ).

Here, although TRC objected that jury question number 12 did not properly set out any elements of damages to be considered by the jury, it did not tender a written instruction on the proper measure of damages in substantially correct form. Therefore, TRC did not preserve this issue for appellate review.

Relying on the oft-quoted language in *State Department of Highways and Public Transportation v. Payne* that "[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether

the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling," TRC argues that it preserved error because it sufficiently made the trial court aware of its complaint and obtained a ruling. 838 S.W.2d 235, 241 (Tex. 1992). The supreme court in *Payne* held that a question submitted in writing by the State was sufficient to preserve its argument on appeal that the trial court erred by submitting an erroneous jury question. *Id.* at 239–41. This case presents a completely different set of circumstances. The issue here concerns the omission of an instruction on the proper measure of damages. While rule of civil procedure 272 expressly permits a party to object to a jury question *either* in writing or orally, rule 278 specifically requires that challenges to the omission of an instruction be preserved by written submission in substantially correct form. Tex. R. Civ. P. 272, 278; *see Payne*, 838 S.W.2d at 241 ("[W]e do not revise our rules by opinion."). Considering *Payne*'s specific facts and the rules of civil procedure, we agree with Accor that *Payne* did not abrogate the rule in *Cameron* that a party must have tendered a written instruction on the measure of damages in substantially correct form to later complain on appeal about a damages question that omitted an instruction on the measure of damages. *See, e.g., Elliott v. Whitten*, No. 01-02-00065-CV, 2004 WL 2115420, at *11–12 (Tex. App.—Houston [1st Dist.] Sept. 23, 2004, pet. denied) (mem. op.) (reasoning similarly).

TRC argues that it would have been "sheer guesswork to try to craft such an instruction because Accor itself never disclosed to the court or [TRC] what damages it was suing for," but as we explain in addressing TRC's sixth issue, the jury's damages award was not derived from sheer guesswork. We decline to overlook TRC's burden to tender a written instruction on account of Accor's purported omissions throughout the litigation. We overrule TRC's fifth issue.

## VII. ACCOR'S DAMAGES

In its sixth issue, TRC argues that the evidence is legally and factually insufficient to support the jury's finding in question number 12 that Accor sustained damages in the amount of $236,174.70. TRC contends that the only evidence about Accor's damages was Burgess's testimony that after TRC suspended service, but before Source completed its transition period, Accor had to use internal employees to answer the help line, there was a risk that Accor could incur liability if its 911 service did not function properly, and the potential existed that any customers who had a negative experience could choose to not stay at another of Accor's properties in the future. TRC argues that Accor "provided no scintilla of quantification for any valuation for these concerns over liability of loss of customers, or damages in any other form." We agree that Accor offered no evidence attempting to quantify Burgess's testimony about potential liability, but there was other evidence that the jury relied upon to arrive at its damages award.

21

"The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained." *Stewart v. Basey*, 150 Tex. 666, 670, 245 S.W.2d 484, 486 (1952). As Accor explains, the evidence shows that it paid TRC recurring-services fees for August and September 2006 but that Accor did not receive the recurring services for part of August and all of September 2006 because TRC had suspended service. Calculating the recurring-services fee paid per day for the month of August 2006 (approximately $6,383), multiplying it times six days[8] (August 26 through August 31, 2006), and adding it to a recurring-services fee for September 2006 ($197,876.10) results in a figure of $236,174—an amount identical to the finding made by the jury in question number 12.

TRC argues that Accor was not entitled to recover damages for the August and September 2006 recurring services that it paid because section g.1.(b) of Modification 2 provided that "any suspension of Services resulting from such Default shall not relieve [Accor] of monies due under this Agreement for the term of any such suspension." However, this language required Accor to continue to pay for services during the period of a suspension; it does not prohibit a jury from later awarding Accor damages based on services that Accor paid for, but did not receive, as a result of an improper suspension and breach by TRC. *See Dynegy*

---

[8]TRC suspended service on August 24, 2006, but the jury apparently did not count August 25, 2006, as a day that Accor did not receive recurring services.

22

*Midstream, Servs., L.P. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) ("We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning.").

TRC additionally argues that because the jury found in question 5B that TRC did not improperly continue suspending service after it had received payment of overdue invoices on September 1, 2006, "the period of any wrongful suspension is confined to August 24-September 1," and there is no evidence that Accor sustained $236,174.70 in damages during that brief period. But as we have explained before, a jury's failure to find a particular fact merely means that the proponent failed to meet its burden of proving the fact by a preponderance of the evidence. *Dunnagan v. Watson*, 204 S.W.3d 30, 40 (Tex. App.—Fort Worth 2006, pet. denied) (citing *C & R Transp., Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966)). It does not mean the reverse of the failed fact finding. *Id.* Thus, the jury was not precluded from considering as damages the fees that Accor paid TRC for September's recurring services.

We hold that the evidence is legally and factually sufficient to support the jury's damages finding. We overrule TRC's sixth issue.

## VIII. ATTORNEYS' FEES

In its seventh issue, TRC challenges the legal and factual sufficiency of the evidence to support the jury's finding in question number 14 awarding Accor $190,000, $25,000, and $5,000 in attorneys' fees for, respectively, representation

23

at the trial level, at the court of appeals, and at the supreme court.  Just before

TRC rested, it presented testimonial and documentary evidence of its attorneys'

fees.  The following exchange then occurred during Accor's cross-examination of

TRC's attorney:

> Q.    I didn't go to Cal Tech and -- but I've heard that for every action, there is a corresponding and opposite reaction.  Is that an engineering principle?
>
> A.    Yes, it is.
>
> Q.    I would, therefore, assume that the figures that you have stated for your firm as reasonable charges would be figures that would be certainly reasonable for Accor in response to the -- the amounts that -- and time that was spent?
>
> A.    Yes.  I think it's commensurate on both sides.

For whatever reason, Accor did not go on to present any evidence of its own

attorneys' fees.  Nevertheless, Accor argues that the evidence is legally and

factually sufficient to support the jury's award because TRC's attorney's

testimony that he thought the reasonableness of the fees charged was

commensurate on both sides constituted either a judicial admission, thus

dispensing with the need for Accor to present evidence of reasonable attorneys'

fees, or a quasi-admission, which is some evidence supporting the jury's award.

We disagree with each explanation.

A judicial admission is a formal waiver of proof usually found in pleadings

or the stipulations of the parties.  *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*,

606 S.W.2d 692, 694 (Tex. 1980).  It is conclusive upon the party making it, and

24

it relieves the opposing party's burden of proving the admitted fact and bars the admitting party from disputing it. *Id.* The public policy underlying the rule is that it would be unjust to permit a party to recover after he has sworn himself out of court by clear, unequivocal testimony. *Id.* The elements commonly recited for a judicial admission are: (1) a statement made during the course of a judicial proceeding; (2) that is contrary to an essential fact or defense asserted by the person making the admission; (3) that is clear, deliberate, and unequivocal; (4) that, if given conclusive effect, would be consistent with public policy; and (5) that is not destructive of the opposing party's theory of recovery. *Lee v. Lee*, 43 S.W.3d 636, 641–42 (Tex. App.—Fort Worth 2001, no pet.); *see Mendoza*, 606 S.W.2d at 694.

Our supreme court has confirmed the requirements that the admission be clear and intentional. In *Gevinson v. Manhattan Construction Co. of Oklahoma*, the court reasoned, "[W]hether the admission be made orally from the witness stand or in a written instrument introduced in evidence, it is essential, among other things, that the statement be clear and unequivocal." 449 S.W.2d 458, 466 (Tex. 1969). And as Justice Greenhill once explained, "It is of the nature of an admission, plainly, that it be *by intention* an act of waiver." *Griffin v. Superior Ins. Co.*, 161 Tex. 195, 204, 338 S.W.2d 415, 420 (1960) (Greenhill, J., dissenting) (quoting 9 Wigmore on Evidence (3rd Ed.) 597, § 2594a) (emphasis added).

Here, Accor's question and TRC's attorney's answer can be interpreted in any number of ways. One interpretation—Accor's—is that TRC admitted or stipulated that Accor is entitled to recover over $200,000 in reasonable attorneys' fees. Another interpretation—TRC's—is that TRC did not admit anything, including that Accor is entitled to recover attorneys' fees. Yet another interpretation—considering that Accor's question was posed before it had presented its case-in-chief—is that Accor was merely setting the stage to prove up its own attorneys' fees by asking TRC's attorney something to the effect of, "Well, if your figures are reasonable, wouldn't my figures, which are similar to yours, also be reasonable?" However, our responsibility on appeal is not to determine whether potential interpretation A is correct, whether potential interpretation B is correct, or whether potential interpretation C is correct. Our task is to recognize that *because* multiple interpretations of the testimony exist, TRC's attorney did not *clearly* admit that Accor was entitled to recover reasonable attorneys' fees. The matter is anything but clear. And if TRC's attorney did not clearly so admit or stipulate, we cannot conclude that TRC deliberately, or intentionally, waived the requirement that Accor present evidence of reasonable attorneys' fees.

In addition to requiring a clear and deliberate statement, "it is important to consider whether the statement relates to facts peculiarly within the declarant's own knowledge or is simply his impression of a transaction or an event as a

participant or an observer." *Gevinson*, 449 S.W.2d at 466. This is because "[i]f a party's testimony consists only of a narrative of events in which he participated or which he observed, there is an obvious possibility that he may be mistaken like any other witness." *Griffin*, 161 Tex. at 204, 338 S.W.2d at 420 (Greenhill, J., dissenting).

TRC's attorney's testimony that he thought the reasonableness of the fees charged was commensurate on both sides appears to be nothing more than the impression that he gathered from litigating the case against Accor for several years. There is nothing in the record to indicate that he had any knowledge about the peculiars of Accor's attorneys' fees. *See Mendoza*, 606 S.W.2d at 695 ("We are of the opinion that Mendoza's opinion testimony was not so clear and unequivocal as to come under the rule announced in Carr, and that the possibility of a mistake has not been eliminated.").

Accor alternatively argues that TRC's attorney's testimony was a quasi-admission and, therefore, some evidence of reasonable attorneys' fees. Unlike a judicial admission, a quasi-admission is not conclusive upon the person making the admission, but it is some evidence of the statement. *Id.* at 694. Nonetheless, the reasonableness of attorneys' fees is generally a question of fact to be determined by the factfinder, and the award, if any, must be supported by competent evidence. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). When considering the reasonableness of a fee, the factfinder should consider the

27

factors set out in *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). The supreme court also recently clarified that a lodestar calculation requires certain basic proof necessary to support an award of reasonable attorneys' fees—evidence about the number of hours worked, the rate charged, the nature of the work, and when the work was performed. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012).

To the extent that TRC's attorney's statement is a quasi-admission, it was conclusory and devoid of any evidentiary substance upon which the jury could have based its fees award because there is no evidence attempting to establish the reasonableness of the fees through application of any of the *Arthur Andersen* factors or, if applicable, the *El Apple* requirements. Accor argues that it can rely upon TRC's attorney's testimony as evidence of the *El Apple* requirements, but that evidence was specific to TRC's attorneys' fees, not Accor's. The record is completely devoid of any evidence specifically detailing the reasonableness of Accor's fees, and a bare conclusion offered by TRC's attorney simply cannot supply the proof necessary to support the jury's award. *See, e.g.*, *In re A.A.L.*, No. 12-11-00161-CV, 2012 WL 1883763, at *2–3 (Tex. App.—Tyler May 23, 2012, no pet.) (mem. op.) ("Renee's attorney did not testify, nor did he present an affidavit, itemized statements, exhibits, or any other offer of proof, about the reasonableness of his fees."); *O & B Farms, Inc. v. Black*, 300 S.W.3d 418, 422–23 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ("Counsel's bare

28

testimony of the name of his law school, his years practicing, and the hours he worked on the case does not establish that any particular fee is reasonable."); *see also Cas. Underwriters v. Rhone*, 134 Tex. 50, 54, 132 S.W.2d 97, 99 (1939) (reasoning that bare conclusions, even if admitted without objection, are no evidence).

We hold that the evidence is legally insufficient to support the jury's award of attorneys' fees to Accor. Accordingly, we sustain TRC's seventh issue.

## IX. CONCLUSION

Having sustained TRC's seventh issue, we modify the final judgment to delete the portion awarding Accor $190,000 in attorneys' fees for preparation and representation in the trial court; $25,000 in attorneys' fees for an unsuccessful appeal by TRC in the court of appeals; and $5,000 in attorneys' fees for an unsuccessful appeal by TRC to the supreme court. Having overruled the remainder of TRC's issues, we affirm the trial court's judgment as modified. *See* Tex. R. App. P. 43.2(b).

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: GARDNER, WALKER, and MEIER, JJ.

DELIVERED: March 13, 2014

29