

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00420-CV

———————————————

KASEY HOLDRIDGE; ROBERT A. LYONS, P.A.; ROBERT A. LYONS, M.D.;
AND CLEARVIEW SURGERY CENTER, INC., Appellants

V.

WALLACE RYNE, O.D., P.C.; AND WALLACE "WALLY" RYNE, Appellees

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-333004-22

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Appellant Robert A. Lyons and Appellee Wallace "Wally" Ryne (each acting through his respective professional entity[1]) co-own an Eyecare Partnership where Appellant Kasey Holdridge works. Lyons also owns a related Surgical Center[2] that—pursuant to a longstanding oral agreement (the Sharing Agreement) between him and Ryne—works hand-in-hand with the Eyecare Partnership, transfers its income to that Partnership, and relies on it for administrative functions.

In 2016, as Ryne's retirement neared, he, Lyons, and Holdridge entered into a contract—the Holdridge Agreement—which provided for Lyons's purchase of Ryne's 50% interest in the Eyecare Partnership for "the Partnership Fair Market Value" and for Lyons's subsequent sale of half of that interest to Holdridge. But the parties later disputed the meaning of "the Partnership Fair Market Value," and things deteriorated from there.

---

[1]The parties' presentations of evidence largely glossed over the distinctions between the doctors and their respective professional entities, and the trial court's final judgment could only have relied on Lyons's actions as an individual to hold Lyons's professional entity liable for breaches of contract and fiduciary duty. Because the corporate distinctions are not dispositive, we treat the doctors as one with their respective professional entities, but solely for purposes of this appeal.

[2]Although the Surgical Center—Clearview Surgery Center, Inc.—was listed in the style of the trial court's case and joined in the notice of appeal, the parties' live pleadings did not include any claims brought by or against that entity and the final judgment did not grant any relief for or against it.

Following a bench trial, the trial court declared that "the Partnership Fair Market Value" had its ordinary meaning (Ryne's proposed interpretation), and the court found that (1) Lyons had breached his fiduciary duties to Ryne by threatening to deviate from the Sharing Agreement and by actually deviating from that Agreement; (2) Lyons had breached the Partnership Agreement so as to undermine Ryne's sale of his interest to a third party; and (3) Holdridge had tortiously interfered with the same third-party sale and with the Partnership Agreement. Going further, the trial court dissolved the Eyecare Partnership due to Lyons's actions, which Ryne characterized as having created a "toxic," "poisonous" workplace.

Lyons and Holdridge now appeal, raising sixteen issues. Their challenges include questioning the trial court's interpretation of "the Partnership Fair Market Value," disputing the sufficiency of the evidence of their alleged breaches and tortious acts, and protesting the dissolution of the Eyecare Partnership. Not only do many of these issues have merit, but many also raise significant concerns.

Although the trial court appropriately interpreted the phrase "the Partnership Fair Market Value," we agree with Lyons and Holdridge that there was no evidence of their alleged breaches or tortious interference. And, more importantly, dissolution of the Eyecare Partnership was not warranted. The public policy of this state has long respected the sanctity of contracts and encouraged trade and economic development. A disagreeable workplace—even a "toxic" workplace—is not among the narrow statutory grounds that authorize the judiciary to intervene and shut down a profitable

3

private company that all partners agree is fulfilling its purposes. Therefore, we affirm in part and reverse and render in part.

## I. Background

Ryne—an optometrist—and Lyons—an ophthalmologist—became equal partners in the Eyecare Partnership when Lyons purchased his predecessor's 50% interest in late 2010.[3] The Eyecare Partnership's practice did not materially change during this transition, but Ryne and Lyons nonetheless signed a new Partnership Agreement.

### A. Partnership and Sharing Agreements

In the 2010 Partnership Agreement, Ryne and Lyons agreed that the Eyecare Partnership would provide "laser vision correction and other procedures to treat myopia, hyperopia, astigmatism, and other vision disorders." The Partnership Agreement further stated that if either partner received a "bona fide offer" from a third party to purchase his interest, then the nonselling partner would be entitled to receive notice of the offer, and he would have 30 days from the notice to exercise his right of first refusal to purchase the selling partner's interest on the same terms.

When Lyons bought into the Eyecare Partnership, he also purchased his predecessor's interest in a related ophthalmology-specific business: the Surgical Center.

---

[3]Lyons's predecessor was an ophthalmologist who had formed the Eyecare Partnership with Ryne in 1999.

Under Lyons's predecessor, the Surgical Center had worked hand-in-hand with the Eyecare Partnership; the two businesses had operated out of the same building and had shared employees and "back office" operations. In fact, the Surgical Center had been formed with such hand-in-hand coordination in mind.[4] And as part of this informal arrangement, Lyons's predecessor had shared the Surgical Center's income with the Eyecare Partnership, while the Eyecare Partnership had handled the Surgical Center's administrative functions.

Given this precedent, when Lyons took over the Surgical Center and bought into the Eyecare Partnership, he and Ryne orally agreed to continue the coordination between the two entities.

## B.     Holdridge Agreement

Years passed, and Ryne and Lyons continued to focus their individual practices on vision correction procedures. Ryne screened surgical patients, Lyons performed the surgeries, and both provided pre- and post-operative care. Meanwhile, they relied on Holdridge[5] and another optometrist to provide the Eyecare Partnership's primary eyecare services. But, eventually, Ryne began contemplating retirement.

---

[4]Lyons's predecessor had formed the Surgical Center in 2005 when the Eyecare Partnership moved into a larger facility that had enough room to house not only the Eyecare Partnership but also an ambulatory surgical facility.

[5]Holdridge had interned at the Eyecare Partnership, and she joined the Eyecare Partnership as an employee in 2004, just before the Eyecare Partnership transitioned to a larger facility. As part of this transition, the Eyecare Partnership expanded its practice

Since hiring Holdridge in 2004, Ryne had indicated to her that he intended to sell her his 50% interest in the Eyecare Partnership when he retired.[6] But as it turned out, when Lyons bought into the Eyecare Partnership, he did so with the intent to exercise his right of first refusal to purchase Ryne's interest upon Ryne's retirement. After this conflict came to light in 2015, Ryne, Lyons, and Holdridge entered into a short contract—the Holdridge Agreement—that provided that Lyons would purchase Ryne's 50% interest for "the Partnership Fair Market Value" and that Lyons would then immediately offer to sell Holdridge a 25% interest. The sale to Lyons was to occur "no later than March 31, 2025."

## C. Deteriorating Relationships

Lyons and Holdridge later testified that when they signed the Holdridge Agreement, they believed that Ryne was planning to retire by age 65, i.e., by 2018. But Ryne did not retire when they expected; he continued to work.

Finally, in 2021, Ryne offered to sell his 50% interest to Lyons for what he considered to be fair market value: $5.5 million.[7] Lyons balked at the offer and sought a third-party appraisal of the Eyecare Partnership, which appraisal excluded the Surgical

---

to include primary eyecare services, and Holdridge was hired to spearhead the provision of those services.

[6]Ryne had indicated this to Holdridge as early as 2004.

[7]Ryne later explained that this figure was based on an appraisal that included the Surgical Center's revenue in its analysis.

6

Center's revenue from its analysis and valued the Eyecare Partnership at $3.1 million. At that point, Ryne's relationships with Lyons and Holdridge became "dicey."

Holdridge later explained that, from her perspective, the relationship had soured because Ryne had reneged on his commitment to sell her his full 50% interest, which was a key component of what had led her to join the Eyecare Partnership. Feeling "wronged," she questioned whom she could trust, and she began recording her conversations with Ryne and with some of the other staff members. At the same time, the number of disagreements between Lyons and Ryne grew. The two butted heads regarding various business matters, such as whether to increase the number of surgery days, whether to hire an additional surgeon, and whether to allow other professionals to use the Eyecare Partnership's facilities. According to Ryne, the staff took Lyons's and Holdridge's sides in these spats and gossiped about Ryne, calling him unflattering names behind his back and causing him to feel increasingly isolated.

## D. Newberry Offer

In 2021, Ryne—having been unable to agree with Lyons on a price for Ryne's share of the Eyecare Partnership—met with his friend and fellow optometrist Eric Newberry to solicit an offer for the purchase of his Partnership interest. Newberry soon hired Ryne's attorney to prepare a letter offering to buy half of Ryne's 50% interest for $2.5 million (the Newberry Offer). In compliance with the Partnership Agreement giving Lyons a right to notice and a 30-day option period to intervene, Ryne's counsel provided Lyons with a copy of the Newberry Offer on September 23, 2021. Around

the same time, Ryne's counsel sent Lyons a "term sheet" that proposed separating the "revenue, expenses, employees, etc." of the Eyecare Partnership and the Surgical Center.

Lyons's counsel responded to both communications in a single letter dated October 4, 2021. The response questioned the basis for Dr. Newberry's $2.5 million valuation, and it disagreed with some of the details of the term sheet's proposed separation of the Eyecare Partnership and the Surgical Center, stating that the "sharing of revenue by [the Surgical Center] . . . was not consistent with [Lyons's] documented purchase of all of [the Surgical Center]," and that the Surgical Center's "overpayment" to the Eyecare Partnership would need to be evaluated, but that Lyons "ha[d] no problem with evaluating and allocating all expenses in a fair manner."[8] Then, in another letter on October 15, 2021, Lyons's counsel reiterated his skepticism regarding the basis for Newberry's $2.5 million valuation, observing that it appeared Newberry "may [have been] relying on revenue that should not be included in [the Eyecare Partnership]." Ryne later testified that he construed these letters—particularly the October 4 letter— as threatening to thwart the Newberry Offer by changing the Sharing Agreement and that when Ryne notified Newberry of the threat, it "killed the deal."

---

[8]The October 4, 2021 letter also sought clarification of a "claim" that Ryne was asserting under the Partnership Agreement. It is unclear what the referenced "claim" was.

Later, on October 23, 2021, Lyons's 30-day option period expired without his having acted on the Newberry Offer—without him having exercised his right to purchase Ryne's interest or having given Ryne written notice that he would not be exercising this right—in part because Lyons had concluded that the Newberry Offer was not a "bona fide offer" as that term was used in the Partnership Agreement. Regardless, Ryne claimed that Lyons's failure to give written notice that he would not be exercising his option was another cause of the Newberry Offer's demise. And according to Ryne, Holdridge was "in cahoots" with Lyons throughout this time, undermining the Newberry Offer by gossiping, taking photographs of Ryne's workstation, and recording conversations between her and Ryne.

## E. Bench Trial and Judgment

The current litigation ensued, and after a bench trial, the trial court rendered judgment for Ryne on numerous claims.[9] It issued a declaratory judgment that the term "the Partnership Fair Market Value" in the Holdridge Agreement had its ordinary meaning, and it found that

---

[9]After all parties had rested and closed, the trial court recalled two witnesses, Lyons and Holdridge, pointedly questioning them, and effectively admitting an exhibit that had not been introduced into evidence during the parties' trial presentations. But because Lyons and Holdridge do not complain about this conduct on appeal, we do not address the propriety of such behavior.

- Lyons (or, rather, his professional entity)[10] had breached the Partnership Agreement by failing to give notice that he would not exercise the right of first refusal, causing damages of $2.5 million (the amount of the Newberry Offer);

- Lyons (i.e., his professional entity) had breached his fiduciary duty to Ryne (i.e., Ryne's professional entity) by threatening to deviate from the Sharing Agreement, resulting in $2.5 million in damages and warranting $1.16 million in exemplary damages;

- Lyons (i.e., his professional entity) had breached his fiduciary duty to Ryne (again, Ryne's professional entity) by paying a $6,891.11 legal bill with Surgical Center funds that would otherwise have been deposited with the Eyecare Partnership, resulting in damages equal to Ryne's half of the amount of the attorney bill; and

- Holdridge had tortiously interfered with the Newberry Offer and the Partnership Agreement, resulting in $2.5 million in damages and warranting $500,000 in exemplary damages.

Finally, the trial court entered "a decree of dissolution of the [Eyecare Partnership]," finding that Lyons's conduct required the remedy because it frustrated the Eyecare Partnership's economic purpose and made it not reasonably practicable to carry on business with Lyons or in conformity with the Partnership Agreement.

---

[10]As previously noted, the trial court's final judgment necessarily relied on Lyons's actions as an individual to hold Lyons's professional entity liable for breaches of contract and fiduciary duty. Lyons complains of this on appeal, but he does so in a single sentence with no record or legal citations and without designating his complaint as a separate issue presented. Regardless, because we reverse the breach of contract and breach of fiduciary duty judgments on other grounds, the corporate distinctions are not dispositive, and we need not address them. *See* Tex. R. App. P. 47.1.

10

## II. Discussion

Lyons and Holdridge's sixteen appellate issues boil down to five questions:[11] (1) whether the trial court correctly interpreted the phrase "the Partnership Fair Market Value" in the Holdridge Agreement; (2) whether the evidence was sufficient to establish that Lyons breached any fiduciary duty; (3) whether the evidence was sufficient to establish that Lyons breached the Partnership Agreement; (4) whether the evidence was sufficient to show that Holdridge tortiously interfered with the Newberry Offer and Partnership Agreement; and (5) whether the evidence was sufficient to support dissolution of the Eyecare Partnership.

### A. Interpretation of the Holdridge Agreement

Lyons and Holdridge's first four arguments relate to the trial court's construction of the phrase "the Partnership Fair Market Value" in the Holdridge Agreement, along with the various findings that followed from that construction.

---

[11]In single-sentence assertions scattered throughout their joint brief, Lyons and Holdridge lodge additional complaints, such as (previously noted) that Lyons's professional entity cannot be held to have breached its fiduciary duty based on Lyons's individual actions and that tort damages are not available for contract-related breaches of fiduciary duty. Many of these assertions lack record or legal citations, none are assigned separate issues, and none are accompanied by legal analysis. To the extent that Lyons and Holdridge intended to raise these single-sentence assertions as separate issues for our review, they do not reflect substantial compliance with the briefing rules and have been inadequately briefed. *See* Tex. R. App. P. 38.1(f), (i), 38.9; *Perkins v. Hicks*, No. 02-19-00207-CV, 2020 WL 7393334, at *1 (Tex. App.—Fort Worth Dec. 17, 2020, no pet.) (per curiam) (mem. op.) (holding appellant inadequately briefed complaints when she provided "only a few scant citations to the record, no citations to legal argument, and no legal argument presenting her issues").

### 1.  Law:  Contract Construction

We construe unambiguous contracts as a matter of law, giving effect to the parties' intent as that intent is expressed in the written agreement.  *See Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023); *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).  "[A]ll the usual 'rules of construction' apply," including "the familiar presumptions favoring consistent usage, disfavoring surplusage, . . . using the plain meaning of undefined terms" unless the instrument indicates that the parties intended otherwise, and construing the contract as a whole.  *Mosaic Baybrook One*, 674 S.W.3d at 257 (quoting *Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228, 236 (Tex. 2022)); *see Dynegy Midstream Servs.*, 294 S.W.3d at 168.

Determining what the "whole" is—what is and is not considered part of the contract—is another component of contract construction and one particularly relevant here.  *See ExxonMobil Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 672 S.W.3d 415, 418–19 (Tex. 2023); *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968).  We begin with the four corners of the contract.  *ExxonMobil*, 672 S.W.3d at 418–19; *In re Deepwater Horizon*, 470 S.W.3d 452, 459–60 (Tex. 2015).  However, the parties may incorporate a separate document so as to make it part of the terms of the agreement if the contract "clearly manifest[s]" an intent to do so.  *ExxonMobil Corp.*, 672 S.W.3d at 417; *Deepwater Horizon*, 470 S.W.3d at 460.  Such a demonstration "requires more than merely mentioning the document"; it requires "plainly refer[ring]" to the other document.  *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding) (quoting

*Owen*, 433 S.W.2d at 166); *Gross v. WB Tex. Resort Cmtys., L.P.*, No. 02-12-00411-CV, 2014 WL 7334950, at *3 (Tex. App.—Fort Worth Dec. 23, 2014, no pet.) (mem. op.) (quoting *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.)).

## 2. Application: "The Partnership Fair Market Value"

The trial court construed the Holdridge Agreement's phrase "the Partnership Fair Market Value" based on that phrase's plain and ordinary meaning, but Lyons and Holdridge assert that it was a defined term that was given a specialized meaning in the Partnership Agreement. They argue that the Partnership Agreement was incorporated into the Holdridge Agreement, that the two must be construed together, and that the Holdridge Agreement's capitalization of "Partnership Fair Market Value" and use of the accompanying definite article "the" invoked the Partnership Agreement's definition of "Fair Market Value."

We disagree with Lyons and Holdridge's foundational premise that the Holdridge Agreement incorporates the Partnership Agreement.[12] The Holdridge

---

[12]Even if the Holdridge Agreement had incorporated the Partnership Agreement, the term used in the former—"Partnership Fair Market Value"—is not the same as the term defined in the latter—"Fair Market Value." And in the Partnership Agreement, the applicability of the defined term "Fair Market Value" is expressly limited to two types of transfers: those that occur "under the provisions of Sections 7.4 and 7.5," i.e., upon the "divorce or death of [a partner's] spouse" or upon a party's "acqui[sition of] a Partnership Interest . . . as the result of an order of a court," a "lawful 'charging order,'" or an "unauthorized transfer or assignment." [Capitalization altered.]

13

Agreement does not contain an express statement of incorporation, it does not include the Partnership Agreement as an attachment or exhibit, and it does not commit the Holdridge Agreement signatories to fulfilling any of the terms set forth in the Partnership Agreement. *See Gross*, 2014 WL 7334950, at *3 (holding that contract's mention of buyer's receiving property report did not incorporate property report by reference because "there [wa]s no language in the contract that indicate[d] any intent to incorporate it"). Nothing in the Holdridge Agreement's language "obligate[s]" or "requires" us to "venture beyond the four corners" of that document. *ExxonMobil Corp.*, 672 S.W.3d at 418–19 (noting that courts "refer to extrinsic documents only if th[e contract] clearly requires doing so" and "only to the extent of the incorporation and no further"); *Deepwater Horizon*, 470 S.W.3d at 460 (noting that court would not consider insurance coverage limitations in other documents "[u]nless obligated to do so by the terms of the policy"). At best, the Holdridge Agreement references the Partnership Agreement for informational purposes, much like the contract construed by our sister court in *Bob Montgomery Chevrolet*. 409 S.W.3d at 184–93.

In that case, an automobile dealership applied to become a certified repair center for Dent Zone, and the application form stated that the dealership would work "within the [relevant] Service Program" and that "[a]dditional benefits, qualifications[,] and details of the [relevant] Service Program [we]re available for [the dealership's] review at [Dent Zone's] website," with a link to an internet document. *Id.* at 184–86. The internet document contained a forum-selection provision, and when disputes between the

14

parties later arose, the applicability of that forum-selection provision became a key issue. *Id.* at 188–89. But the Dallas Court of Appeals concluded that the application form's language did not incorporate the internet document by reference such that the dealership had agreed to the forum-selection provision. *Id.* at 188–93. It explained that the application had "indicate[d] that the internet document contained informative material only"—the application did not expressly incorporate the internet document, it did not "plainly refer to additional terms and conditions in the internet document as becoming part of the parties' agreement," and it did not "otherwise suggest that the parties intended for the internet document to become part of their agreement." *Id.* at 190.

We apply the same reasoning to the Holdridge Agreement. The Holdridge Agreement states that "once [Holdridge] buys [25% of Ryne's interest from Lyons] and signs the Partnership Agreement[,] . . . [she] will be a Partner in [the Eyecare Partnership]." Apart from this statement, no other reference is made to the Partnership Agreement.[13] The Holdridge Agreement does not expressly include or adopt the Partnership Agreement's terms, and the signatories do not agree to be bound by the Partnership Agreement's provisions. *But cf. In re Prudential*, 148 S.W.3d at 135 (holding

---

[13]Lyons and Holdridge construe the Holdridge Agreement's references to "the partners," "the Partnership," and Holdridge's "future rights" in the business as additional references to the Partnership Agreement. But these phrases merely reference the parties and entity involved, as opposed to the Partnership Agreement document itself.

15

that guaranty incorporated lease's jury waiver when guaranty contained a promise "to 'faithfully perform and fulfill all of [the] terms . . .' of the lease in the event of . . . default"). To the contrary, the Holdridge Agreement contemplates that for Holdridge to become a partner in the future, she must at that time sign the Partnership Agreement and commit to its terms. As in *Bob Montgomery Chevrolet*, the Holdridge Agreement's language "indicates [that] the [Partnership Agreement] contained informative but noncontractual material."[14] 409 S.W.3d at 193.

Construing the Holdridge Agreement based on the four corners of the document, then—with no other documents incorporated by reference—the term "the Partnership Fair Market Value" has no specialized meaning. Although the term is capitalized and accompanied by the definite article "the,"[15] neither characteristic is determinative—particularly when, as here, the capitalized term is not defined anywhere in the document. *Cf. Jefferson Cnty. v. Jefferson Cnty. Constables Ass'n*, 546 S.W.3d 661, 670 (Tex. 2018) (noting that "[t]he word 'the' can certainly be used as a definite article, but

---

[14]Lyons and Holdridge make much of the fact that, unlike the internet document in *Bob Montgomery Chevrolet*, the Partnership Agreement was signed. But the Partnership Agreement was signed by only a subset of the parties to the Holdridge Agreement, and Lyons and Holdridge have not cited any case law to support distinguishing the case on that basis.

[15]*Cf. TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 709 (Tex. 2023) (interpreting arbitration rules and noting that "the use of the definite article 'the' with the singular noun 'power' indicates exclusivity"); *Concierge Nursing Centers, Inc. v. Antex Roofing, Inc.*, 433 S.W.3d 37, 48 n.5 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (noting that contracts at issue "use[d] capitalizations to define the words").

it is not necessarily so limiting"); *Henry F. Coffeen III Mgmt., Inc. v. Musgrave*, No. 02-16-00070-CV, 2016 WL 6277375, at *3 n.4 (Tex. App.—Fort Worth Oct. 27, 2016, no pet.) (mem. op.) (construing contract provision and noting that "[d]espite being capitalized, the 'Term' of the Non-Compete Agreement [wa]s not defined"); *Brookshire v. Longhorn Chevrolet Co.*, 788 S.W.2d 209, 211 (Tex. App.—Fort Worth 1990, no writ) (rejecting argument premised on capitalization and noting that "the contracts in question are void of any provision which states that the term 'Unpaid Balance' when capitalized has a different meaning than when such term is not capitalized"). And "[w]ithout any textually expressed bespoke meaning, . . . courts will adopt the ordinary usage as a matter of law." *Perthuis*, 645 S.W.3d at 236.

The ordinary, unambiguous meaning of "Fair Market Value" is "a price at which buyers and sellers with a reasonable knowledge of pertinent facts and not acting under any compulsion are willing to do business." *Fair Market Value*, Merriam-Webster, https://www.merriam-webster.com/dictionary/fair%20market%20value (last visited July 15, 2024); *see Fair Market Value*, Webster's Third New International Dictionary 86a (reprt. 2021) (1961) (defining fair market value as "a price at which both buyer and seller are willing to do business"). This is precisely the definition declared by the trial court in its judgment.

The trial court thus did not err by issuing declarations that the Holdridge Agreement did not "incorporate any terms from the [Partnership] Agreement," that "the definition of 'Fair Market Value' set forth in . . . the [Partnership]

17

Agreement . . . ha[d] no application to the Holdridge Agreement," and that "the phrase 'Partnership Fair Market Value' as used in the Holdridge Agreement has its plain and customary meaning." We overrule Lyons and Holdridge's four issues challenging these declarations.[16]

This holding also renders harmless Lyons and Holdridge's fifth issue—their allegation that the trial court improperly admitted parol evidence—so we need not address it. *See* Tex. R. App. P. 47.1.

## B.   Evidentiary Sufficiency of Breach of Fiduciary Duty Findings

Lyons next raises three issues challenging the legal sufficiency of the evidence to show that he twice breached his fiduciary duty.

### 1.   Law:  Sufficiency and Fiduciary Duty

Generally, to sustain a claim for breach of fiduciary duty, there must be evidence of (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and

---

[16]In their reply brief, Lyons and Holdridge ask this court to determine whether the Holdridge Agreement amended the sale-related provisions of the Partnership Agreement such that "Ryne is obligated to sell his full partnership interest to Lyons" and no one else, and they assert that this "argument is independent of whether 'the Partnership Fair Market Value' . . . has its plain and ordinary meaning." But in their opening brief, Lyons and Holdridge discuss the issue only as a means of supporting their contention that the Holdridge Agreement incorporated the Partnership Agreement and therefore "the Partnership Fair Market Value" should be given the Partnership Agreement's defined meaning. A party may not use its reply brief to raise new issues. *See* Tex. R. App. P. 38.3; *Perkins*, 2020 WL 7393334, at *1 (holding appellant waived issues when reply brief addressed complaints that were merely "bald assertion of facts" in opening brief).

(4) damages. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). We will reverse a judgment for breach of fiduciary duty if it is supported by legally insufficient evidence, meaning that there is no more than a mere scintilla of evidence.[17] *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018); *see McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 397 (Tex. 2019) (clarifying that evidence is insufficient if it is so weak that it does no more than create a surmise or suspicion). When evaluating legal sufficiency, we view the evidence in a light most favorable to the judgment, indulging every reasonable inference in its favor. *See Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

## 2. Application: No Evidence of Breach

According to Ryne, Lyons twice breached his fiduciary duty by deviating from or threatening to deviate from the Sharing Agreement. Ryne contends that Lyons first breached by "threatening to break his promise to share [the Surgical Center's] revenues with the [Eyecare] Partnership" in his October letters,[18] and, second, he breached by

---

[17]Because the trial court did not file findings of fact or conclusions of law, the final judgment implies all necessary findings. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). But a reporter's record has been filed, so the trial court's implied findings can be challenged on sufficiency grounds. *Id.*

[18]On appeal, Ryne also points to Lyons's "disrupt[ion]" of the Sharing Agreement in January 2022 as evidence of Lyons's breach. But Ryne himself testified that the alleged disruption of funds occurred after Newberry had retracted his offer,

using Surgical Center funds to pay a legal bill rather than forwarding those funds to the Eyecare Partnership as the Sharing Agreement required. Lyons disputes numerous aspects of these allegations, including whether his October letters threatened to deviate from the Sharing Agreement and whether he owed a fiduciary duty to continue the Sharing Agreement at all. But even if we assume that Lyons had a fiduciary duty to continue the Sharing Agreement, the parameters of that alleged duty were too ill-defined to show any breach of it.

Both Ryne and Lyons testified that their Sharing Agreement required the Surgical Center to share its income with the Eyecare Partnership, but it was unclear what income was required to be shared and when. Ryne confirmed that the Surgical Center "sen[t] money over to the [Eyecare P]artnership," and he characterized the businesses as "integrated" and "seamless," but he did not explain what money was or was not required to be "sent . . . over."

The clearest description of the Sharing Agreement's terms came from Lyons, who testified that the Surgical Center had generally shared "money minus expenses." But even if we assume that this general practice was in lockstep with the contractual terms of the Sharing Agreement, "money minus expenses" leaves a lot of open questions.

and Ryne's breach of fiduciary duty claim was based on the theory that Lyons's actions undermined the Newberry Offer.

For example, Ryne testified that Lyons had been "holding . . . money back" such that the Surgical Center was "sitting with about $350,000 in its bank account right now," but he did not elaborate on what the Surgical Center's average balance was, why a $350,000 balance equated to "holding . . . money back," or what specific terms of the Sharing Agreement required that these funds be handled differently. Lyons explained that the Surgical Center "incur[red] a lot of bills" that it needed funds to cover, including "large credit card bills that [it] pa[id] on a regular basis." But there was no evidence of whether the Surgical Center's retention of funds to pay such credit card bills was consistent with or violative of the Sharing Agreement. Adding further complexity, Ryne's counsel elicited testimony from Lyons that the Eyecare Partnership paid the Surgical Center money to cover certain supply costs, and logic would dictate that these payments would increase the balance in the Surgical Center's bank account, albeit temporarily.[19] Even Ryne seemingly acknowledged that the Surgical Center's account balance did not necessarily reflect a violation of the (unexplained) terms of the Sharing Agreement; he conceded that "technically, . . . [Lyons was] within the guidelines" in his handling of the $350,000 bank account balance but insisted that "practically, he[ was] holding th[e] money back."

---

[19]Lyons testified that there had been an "accounting issue" related to the Surgical Center's purchase of premium lenses because the revenue needed to cover the cost of those lenses was being deposited directly into the Eyecare Partnership. Lyons explained that in late 2021, the Eyecare Partnership began paying the Surgical Center for the lenses to allow the latter to pay its bills.

The Surgical Center's payroll was another area of ambiguity. Lyons testified that beginning in 2022, the Surgical Center paid "a monthly payroll on a month-on-month basis" for Surgical Center employees and for employees that it shared with the Eyecare Partnership. But, later, Lyons clarified that the Surgical Center did not issue any W-2 forms and instead used the "online payroll system through [the Eyecare Partnership], and then the [Surgical Center] reimburse[d the Eyecare Partnership] dollar for dollar for those employees on a month-to-month basis." The ins-and-outs of this arrangement were never explored, and neither Lyons nor Ryne explained what the payroll arrangements had been prior to 2022, what they had been under the original Sharing Agreement, or what the Sharing Agreement had required when the Newberry Offer was in play—and thus when Lyons had allegedly breached his fiduciary duty—in late 2021.

Even Ryne seemed unclear regarding how the Sharing Agreement required the Surgical Center's money to be handled. On direct examination, he testified that the Surgical Center's "money flows" were included in the Eyecare Partnership's profit-and-loss statements, but on cross-examination he testified that the profit-and-loss statements from the Eyecare Partnership "were kept separate from" those of the Surgical Center.

22

These areas of fuzziness were merely the tip of the iceberg,[20] and we need not detail them all. Suffice it to say that the terms of the Sharing Agreement were murky at best. And without knowing what the Sharing Agreement did or did not allow Lyons to pay, retain, or deduct from the Surgical Center's revenue before he forwarded the remainder (or some unidentified subset of that remainder) to the Eyecare Partnership, a reasonable factfinder could not have concluded that Lyons's October letters contained a veiled threat to pay, retain, deduct, or forward a different amount. Even assuming that Lyons had a fiduciary duty to continue the Sharing Agreement, then, there was insufficient evidence that his October letters threatened to breach that duty.[21]

The same is true of Lyons's alleged breach of his fiduciary duty by using Surgical Center funds to pay a legal bill. Again, Ryne confirmed that the $13,782.23 in Surgical Center funds that had been used to pay Lyons's counsel would "historically . . . have

---

[20]For example, the agreed-to frequency of the Surgical Center's money transfers was unclear. Ryne testified that, in the past, the money from the Surgical Center had flowed into the Eyecare Partnership at the end of each month, but Lyons testified that the Surgical Center had deposited money with the Eyecare Partnership "occasionally throughout the year" and that it had "never [been] a month to month" arrangement. Neither described what transfer frequency the oral Sharing Agreement actually required.

[21]For that matter, it is unclear when the Newberry Offer was retracted. Ryne's primary breach of fiduciary duty claim was premised on the idea that Lyons's two October letters killed the deal, but his breach of contract claim alleged that Lyons killed the deal by failing to give written notice that he would not be exercising his option to purchase, which notice was due in mid-October. Inferring all fact-findings necessary to support the judgment, as we must, *id.*, we presume that the trial court implicitly found that the Newberry Offer was withdrawn in mid-October and was caused not only by Lyons's October letters but also by his failure to give written notice.

23

flowed into [the Eyecare Partnership]," but he did not clarify whether this practice was required by the terms of the Sharing Agreement or how the Sharing Agreement contemplated the handling of legal expenses.[22]

Because there was legally insufficient evidence of what payments the Sharing Agreement required or permitted and when, no reasonable factfinder could have concluded that Lyons's actions deviated or threatened to deviate from the terms of that amorphous Agreement. We therefore sustain Lyons's challenges to the breach of fiduciary duty judgments. We reverse those judgments, including the awards of $2.5 million and $6,891.11 in compensatory damages and the award of $1.16 million in exemplary damages.

## C. Interpretation of Partnership Agreement

Lyons's next appellate issue relates to his alleged breach of the Partnership Agreement—an alternative basis for the $2.5 million in compensatory damages that were awarded against him for his letter-related breach of fiduciary duty.[23] Lyons

---

[22]On appeal, Ryne notes Lyons's testimony that the Surgical Center's bylaws allowed him to pay the legal bill, and he responds to this testimony on its merits, arguing that the bylaws did not permit the payment. But even if we assume that payment of the legal bill breached the Surgical Center's bylaws, Ryne's cause of action was not based on a violation of the Surgical Center's bylaws. Rather, he alleged—and the trial court found—that Lyons had breached his fiduciary duty to the Eyecare Partnership by deviating from the Sharing Agreement. The scope of pre-transfer expenses permitted by the Sharing Agreement may not have been the same as the scope of expenses permitted by the Surgical Center's bylaws.

[23]Because the $2.5 million in damages attributed to Lyons's breach of contract duplicated those awarded for Lyons's alleged fiduciary duty breach, Ryne elected to

24

contends that, contrary to Ryne's assertions, the Partnership Agreement did not require him to give written notice that he would not be exercising his option to purchase Ryne's interest, so his failure to give such written notice was not a breach.

### 1. Law: Contract Construction

When construing the Partnership Agreement, we seek to give effect to the parties' intent—just as we did with the Holdridge Agreement. *See Mosaic Baybrook One*, 674 S.W.3d at 257; *Perthuis*, 645 S.W.3d at 236. And once again, we rely on the familiar rules of contract construction: we construe the Partnership Agreement as a whole, disfavor interpretations that would render any provision meaningless, and give undefined terms their ordinary meanings. *See Mosaic Baybrook One*, 674 S.W.3d at 257–58; *Perthuis*, 645 S.W.3d at 236; *Dynegy Midstream Servs.*, 294 S.W.3d at 168.

### 2. Application: No Damage-Causing Breach

Ryne's breach of contract allegation centered on the right-of-first-refusal provisions in the Partnership Agreement. Those provisions begin by clarifying that when one partner receives a "bona fide offer" for his interest, the nonselling partner has the right to receive notice of the offer. "Upon receipt of [such] notice," the nonselling partner has "the exclusive option and right of first refusal, exercisable at anytime during a [30] day period from the date of said notice, to purchase [the selling

---

recover damages for the latter, and no damages were assigned to the contract claim. But Ryne argues that, if we reverse the fiduciary duty claim—which we now have—we can nonetheless uphold the $2.5 million award based on his alternative contract theory.

partner's] proportionate part of the interest in the Partnership." The Partnership Agreement then goes on to set forth the procedure for a nonselling partner to exercise his option or for the selling partner to proceed with the sale to a third party:

> If the non-selling Partners decide to exercise the option provided herein, they shall give written notification to this effect to the Partner desiring to sell, and the sale and purchase shall be closed within thirty days thereafter. *If such other Partners elect not to exercise the option, the selling Partner shall be so notified in writing and shall be free to sell the interest in the Partnership covered by the offer set forth in the required notice upon such terms and conditions and to the persons name therein*, provided, that as a condition precedent to such sale the buyer shall execute a counterpart of this Agreement thereby expressly succeeding to all rights, obligations, duties and liabilities of the selling Partner and expressly agreeing to be bound by the terms of this Agreement. The selling Partner shall not effect a sale upon any changed terms or conditions or to any different person without first complying with the requirements of this Article with respect to such different sale.

[Emphasis added.] Ryne alleged—and the trial court found—that Lyons breached this provision because when Lyons "elect[ed] not to exercise [his] option," the Partnership Agreement required that "the selling Partner . . . be so notified in writing," and he did not "so notif[y]" Ryne in writing.[24] According to Ryne, he was prevented from proceeding with his $2.5 million sale to Newberry absent Lyons's written notification.

Whether or not Lyons was contractually obligated to notify Ryne in writing is immaterial, though, because—under the plain language of the Partnership

---

[24]Although Ryne's counsel argued at trial that Lyons's failure to provide notice undermined the Newberry Offer, Ryne did not testify to that. Rather, Ryne testified that the "threats" in Lyons's October letters were what prevented him from completing his deal with Newberry.

Agreement—the lack of notice did not prevent Ryne from moving forward with the Newberry Offer.

The Partnership Agreement unambiguously states that the nonselling partner has "a thirty day period from the date of [the] notice" to exercise his option. If the nonselling partner remains silent and fails to exercise his option within this thirty-day period, the option expires, and his election is established—whether by default, conscious choice, or otherwise. The nonselling partner's silence cannot extend his option period or prevent the third-party sale.

Put differently, nothing in the Partnership Agreement conditions the selling partner's "free[dom]" to proceed with his third-party sale on the receipt of written notice. The right-of-first refusal provisions expressly identify other conditions that must be satisfied for the third-party sale to proceed—e.g., that "the buyer shall execute a counterpart of [the Partnership] Agreement" and that the "selling Partner shall not effect a sale upon any changed terms or conditions or to any different person"—but the receipt of "notif[ication] in writing" is not one of them. Instead, the "free[dom] to sell" is conditioned on the "other Partners elect[ing] not to exercise the option," which again, occurs by default if the option has not been exercised within "a thirty day period from the date of [the] notice." Although the selling partner is entitled to receive "notif[ication] in writing" regarding the nonselling partner's election, once the 30-day option period has passed, the choice is known, and the selling partner has actual notice.

27

Lyons's failure to exercise his option within the 30-day option period was thus implicit actual notice that he would not be doing so, and under the plain language of the Partnership Agreement, Ryne was free to proceed with the Newberry Offer—whether or not Lyons provided written notice. Ryne's theory of recovery for breach of contract thus contradicts the plain language of the Partnership Agreement and cannot support the trial court's $2.5 million award of compensatory damages.

We sustain Lyons's challenge to the breach of contract judgment.

## D.    Evidentiary Sufficiency of Tortious Interference Finding[25]

Next, we turn to Holdridge's contention that there was no evidence that she tortiously interfered with the Newberry Offer and Partnership Agreement.

### 1.    Law:  Sufficiency and Tortious Interference

The elements for interference with a prospective contract (the Newberry Offer) differ slightly from the elements of interference with an existing contract (the Partnership Agreement).

To prevail on a claim for interference with a prospective contract, the plaintiff must establish that

---

[25]In a footnote, Ryne contends that the trial court implicitly granted judgment on his conspiracy claim, and he urges us to affirm the compensatory and exemplary damages rendered against Holdridge on conspiracy grounds. But at trial, when the trial court asked the parties to clarify their live claims, Ryne did not mention his conspiracy claim. And likely for the same reason, the trial court's judgment makes no mention of it. Plus, the final judgment contains a clause denying "[a]ll other relief not expressly granted herein," and Ryne did not file a notice of appeal. *See* Tex. R. App. P. 25.1(c).

(1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party;

(2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct;

(3) the defendant's conduct was independently tortious or unlawful;[26]

(4) the interference proximately caused the plaintiff injury; and

(5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (indentation altered). For tortious interference with an existing contract, the first three elements are replaced with two others; the plaintiff must instead prove (1) the existence of a valid contract and (2) that the defendant willfully and intentionally interfered with the contract. *See Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017).

For Ryne's claims against Holdridge to survive her legal sufficiency challenge, there must be more than a scintilla of evidence to support each challenged element. *See Gunn*, 554 S.W.3d at 658. As with our sufficiency review of Lyons's alleged breaches, we view the evidence in the light most favorable to the judgment. *See id.*

---

[26]"By 'independently tortious' we mean conduct that would violate some other recognized tort duty." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001).

## 2.     Application:  No Evidence of Tortious Interference

Holdridge alleges that there was no evidence of her alleged tortious interference with the Newberry Offer and thus no evidence of her alleged interference with the Partnership Agreement.  Ryne claimed, and the trial court implicitly found, that Holdridge had prevented the Newberry Offer from proceeding and that, by doing so, she had prevented Ryne from exercising his right to sell his interest under the terms of the Partnership Agreement.  But—as Holdridge points out—Ryne was fuzzy on what Holdridge actually did to impede the Newberry Offer.

At trial, Ryne was repeatedly asked to explain what Holdridge had done to tortiously interfere with the Newberry Offer or Partnership Agreement.  He consistently stated that, "[a]t that point in time, [Holdridge] and Dr. Lyons were working in cahoots together"; that they were exchanging text messages regarding Ryne; and that "[t]heir attorneys were working together, so it effectively killed the deal."  Asked the same question again later, Ryne again stated that Holdridge had interfered because she had "been in cahoots with Lyons and, you know, she'[d] hired an attorney and . . . those things . . . kept Newberry from wanting to pursue."  He repeated this answer on three more occasions, pointing to Holdridge's "[h]iring an attorney, working

30

in cahoots with Lyons, [and] creating a workplace that's not normal" as her acts of interference.[27]

Hiring an attorney is not an independently tortious activity. *Cf. Wal-Mart Stores*, 52 S.W.3d at 726 (holding "that to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful"). And apart from this repeatedly mentioned action, it is unclear what "cahoots" Ryne considered Holdridge to have engaged in that interfered with the Newberry Offer.

On appeal, Ryne points to Holdridge's having recorded her conversations with him and having taken photographs of his workstation, characterizing such actions as evidence that she "facilitate[ed] and incentiviz[ed] Lyons'[s] efforts to defeat the Newberry Offer."[28] But while there was evidence that Holdridge had recorded her conversations with Ryne and that she had taken photographs of his workstation, there was no evidence that such recordings or photographs even related to the Newberry Offer—much less that they interfered with it. Ryne testified that he had listened to all

---

[27]Ryne confirmed that his claim for interference with the Partnership Agreement was based on the "same reasons" as his claim for interference with the Newberry Offer: Holdridge's "not letting [him] . . . pursue a third-party offer."

[28]Ryne emphasizes Holdridge's alleged motivation to kill the Newberry Offer, noting that the Newberry Offer "would [have] jeopardize[d] her ability to become an owner" and that she had "admitted to a 'side deal' with Lyons" in which she would pay for 25% of the Eyecare Partnership based on the price Lyons paid to Ryne even if she were not contractually obligated to do so.

of the recorded conversations produced in discovery and that only one percent involved patient care with the remaining "99 percent [involving] personal" matters. He made no mention of any conversations related to the Newberry Offer or his sale of his interest in the Eyecare Partnership.

And as for Holdridge's photographs, while Ryne testified that they included his "personal financial information," he did not explain how or if such information related to the Newberry Offer. Ryne did not connect the dots. The same was true of Ryne's testimony that Holdridge had photographed notes "that [involved] issues that [he was] discussing with [his] lawyers."[29] He failed to explain how or if these photographed notes related to the Newberry Offer, and both he and his counsel confirmed that the objectionable photographs had not been admitted into evidence. Without any additional information about the timing or relevance of the objected-to photographs or recordings, then, the factfinder had no way to determine whether they amounted to "cahoots" that could have interfered with the Newberry Offer.

While secretly recording conversations and taking photographs of another's workstation may be frowned upon in modern American workplaces, there was no evidence that such actions rose to the level of independently tortious activity, as was required to prove interference with a prospective contract. *Cf. id.*

---

[29]On cross-examination, Ryne conceded that he had no evidence that Holdridge or Lyons ever accessed his email or photographed his communications with his attorneys.

32

And while Holdridge's alleged interference with the Partnership Agreement was not required to be independently tortious, that claim is on even shakier ground. Even if we assume that Ryne can bootstrap his claim for interference with the Newberry Offer into a second claim for interference with the Partnership Agreement, it is nonetheless unclear how Ryne's theory of interference holds together. We have already concluded that there was no evidence of Holdridge's interference with the Newberry Offer, and there was no evidence that Holdridge's actions prevented Ryne from exercising his rights under the Partnership Agreement. While Ryne argues on appeal that Holdridge's actions "facilitat[ed] and incentiviz[ed] Lyons'[s] efforts" to defeat the Newberry Offer, Lyons allegedly killed the Newberry Offer by threatening to deviate from the Sharing Agreement and by failing to give written notice that he would not be exercising his right of first refusal, and there is no evidence that Holdridge discussed those actions with Lyons or had any involvement in them while the Newberry Offer was in play. Plus, we have already held that there was no evidence to support Lyons's liability under those theories anyway.

In short, the evidence is legally insufficient to support the tortious interference judgments entered against Holdridge. We sustain Holdridge's challenge to those judgments, including the $2.5 million in compensatory damages and $500,000 in exemplary damages awarded against her based on her alleged interference.

**E.     Evidentiary Sufficiency of Dissolution**

Lyons and Holdridge next challenge the sufficiency of the evidence to support the trial court's dissolution of the Eyecare Partnership.

**1.     Law:  Sufficiency and Dissolution**

By statute, a trial court "has jurisdiction" to order the dissolution, i.e., winding up and termination,[30] of a Texas partnership if the court determines that (1) "the economic purpose of the entity is likely to be unreasonably frustrated," (2) "another owner has engaged in conduct relating to the entity's business that makes it not reasonably practicable to carry on the business with that owner," or (3) "it is not reasonably practicable to carry on the entity's business in conformity with its governing documents."  Tex. Bus. Orgs. Code Ann. § 11.314; *see* Rev. Unif. P'ship Act § 801(5) (2023) (listing substantially similar grounds for judicial order dissolving or winding up partnership).

---

[30]When the Legislature passed the Texas Revised Partnership Act, it largely removed the term "dissolution" and replaced it with references to "winding up" and "termination" of the entity.  *See* 13 Elizabeth S. Miller & Robert A. Ragazzo, 13 *Texas Practice Series: Texas Methods of Practice* § 38:3 n.1 (2024); *see also* Tex. Bus. Orgs. Code Ann. §§ 11.051 (listing events that require "[w]inding up," including "a decree by a court requiring the winding up, dissolution, or termination" of the entity), 11.314 (providing for involuntary "winding up and termination of [a] domestic partnership"); *see also* Rev. Unif. P'ship Act § 801 cmt. 1 (2023) (distinguishing between Uniform Partnership Act's use of "dissolution" to "describe[] the change in the *relationship* among partners" and Revised Uniform Partnership Act's use of the term "to describe the point at which the partnership *as an entity* begins the winding up phase").  However, the trial court and parties used the term "dissolution."

But while a trial court "has [the] jurisdiction" to issue such an order, *see* Tex. Bus. Orgs. Code Ann. § 11.314, "[d]issolution is a drastic remedy that the courts invoke with extreme caution." 19 C.J.S. *Corporations* § 913 (2024); *cf. Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex. 2014) (recognizing that corporate receivership is "a 'harsh' remedy that is not readily available" and is reserved for "exigent circumstances"). The Texas Supreme Court has long cautioned that "liquidation of solvent[,] going corporations [or partnerships] should be the extreme or ultimate remedy." *Patton v. Nicholas*, 279 S.W.2d 848, 856–57 (Tex. 1955) (holding that Texas courts have general equity powers to decree liquidation in "extreme cases" and noting that "the practically unanimous judicial opinion" reserves such remedy for extreme cases); *see Nerium SkinCare, Inc. v. Nerium Int'l, LLC*, No. 3:16-CV-1217-B, 2018 WL 2323243, at \*7 (N.D. Tex. Mar. 26, 2018) (report and rec.) ("Given its extreme nature, judicial dissolution is a limited remedy that [courts] grant [ ] sparingly."), *report and rec. adopted*, No. 3:16-CV-1217-B, 2018 WL 2323471 (N.D. Tex. May 2, 2018); *cf. Mueller v. Beamalloy, Inc.*, 994 S.W.2d 855, 859 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (discussing corporate liquidation provision in predecessor statute and commenting that narrow statutory "'instances' for liquidation are consistent with granting liquidating receivership 'only as a last resort' for a troubled corporation, when the less harsh remedies of appointment of a receiver for specific assets or a rehabilitative receiver are inadequate").

Such caution is consistent with the state's strong public policies favoring the freedom of contract and promoting trade and economic development. *See* Tex. Const.

35

art. I, § 16 (prohibiting "any law impairing the obligation of contracts"); *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768–69 (Tex. 2011) (discussing noncompete provisions and recognizing statutorily declared public policy "to maintain and promote economic competition in trade and commerce"); *Fairfield Ins. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 663 (Tex. 2008) (noting "Texas' general policy favoring freedom of contract"); *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951) ("[I]f there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice." (quoting *Printing & Numerical Registering Co. v. Sampson* [1875] 19 LR Eq. 462, 465)); *cf. Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 298–99 (Tex. 1997) (explaining policy support for duty to mitigate damages and noting that "the public policy of the state of Texas calls for productive use of property as opposed to avoidable economic waste").

"Dissolution proceedings are equitable in nature and contested facts concerning a basis for dissolution are for the [fact-finder]." *CBIF Ltd. P'ship v. TGI Friday's Inc.*, No. 05-15-00157-CV, 2017 WL 1455407, at *9 (Tex. App.—Dallas Apr. 21, 2017, pets. denied) (mem. op.). We review the record in the light most favorable to the judgment, and we will sustain the trial court's dissolution order if there is more than a scintilla of evidence to support it. *See Dunnagan v. Watson*, 204 S.W.3d 30, 42 (Tex. App.—Fort Worth 2006, pet. denied); *see also CBIF Ltd.*, 2017 WL 1455407, at *9.

36

## 2.     Application:  No Evidence to Support Dissolution

The trial court found that "Lyons and Lyons, P.A. ha[d] engaged in conduct relating to the [Eyecare Partnership's] business" that resulted in all three statutory grounds for dissolution—they (1) "ma[de] the economic purpose of the [Eyecare Partnership] likely to be, and in fact ha[d] already caused the economic purpose to be, frustrated"; (2)"ma[de] it not reasonably practicable to carry on the entity's business in conformity with its governing documents"; and (3) "ma[de] it not reasonably practicable to carry on the business with Lyons and Lyons, P.A."  Ryne all but abandons the first ground on appeal, citing no evidence to defend the finding and conceding that "the [Eyecare] Partnership remains profitable."  Indeed, both Ryne and Lyons testified that the Eyecare Partnership was profitable at the time of trial, and Lyons described the Partnership's "financial performance" as continuing "on an upward trajectory"—a fact Ryne concedes on appeal.

But Ryne claims that there was evidence to support the latter two dissolution grounds:  that Lyons's business-related conduct "ma[de] it not reasonably practicable to carry on the entity's business in conformity with its governing documents" or "to carry on the business with Lyons."  *See* Tex. Bus. Orgs. Code Ann. § 11.314(2), (3).  He contends that other jurisdictions have considered "serious and protracted misconduct that seriously fractures the relationship between the partners" to be legally sufficient to

37

support dissolution,[31] and he argues that Lyons engaged in such misconduct by "sow[ing] division within the office"; "denigrat[ing] his partner beyond repair"; creating a "toxic" office environment for Ryne; "fostering an office environment tolerant of spying, secret recording, and name-calling of the founding partner"; and exhibiting general "hostility and animosity" towards Ryne.

Assuming without deciding that Lyons's gossiping and name-calling constitute "conduct relating to the [Eyecare Partnership's] business"—a rather significant assumption—there is no evidence that this conduct prevented the Eyecare Partnership from fulfilling the purposes stated in the Partnership Agreement and no evidence that the conduct made it infeasible to continue fulfilling the Eyecare Partnership's purposes with Lyons. *See id.*

The Partnership Agreement lists three purposes for the business:

(a)    engag[ing] in the business of developing, marketing, providing services to, and managing facilities for laser vision correction and other

---

[31]Ryne cites a list of nonbinding cases from jurisdictions across the country as support for this purported rule, but several of those cases involved dissociation of a partner rather than dissolution of the partnership. *See Giles v. Giles Land Co.*, 279 P.3d 139, 141–51 (Kan. Ct. App. 2012) (holding that partner's conduct—which included threatening the lives of other partners and which led to an "impasse regarding important business"—supported dissociation of partner under Kansas statute because it was not reasonably practicable to carry on business with partner); *Brennan v. Brennan Assocs.*, 977 A.2d 107, 115–22 (Conn. 2009) (affirming order dissociating partner when trial court found that partner had been convicted of fraud, exhibited continuing dishonesty regarding criminal wrongdoing, lodged baseless allegations that others committed fraud, and held veto power resulting in impasse). While still drastic, this is a materially different remedy.

procedures to treat myopia, hyperopia, astigmatism, and other vision disorders (the "Partnership Business"),

(b) incur[ring] and refinanc[ing] indebtedness related to the Partnership Business, and

(c) engag[ing] in or perform[ing] any and all [lawful] acts or activities that are related or incident to the foregoing.

At their core, these three purposes center on the Eyecare Partnership's treatment of vision disorders through laser and similar procedures. And although there was evidence that Lyons and Ryne did not get along and that Lyons had gossiped about Ryne, there was no evidence that Lyons jeopardized patients or impaired the Eyecare Partnership's vision treatment services. *See id.*

Ryne argues that the "unprofessional[]" and "toxic" workplace created by Lyons undermined collaborative care at the office, but Ryne's own testimony showed that he and Lyons continued to collaborate in their treatment of patients. He told the trial court that he stood "shoulder to shoulder with Dr. Lyons every week doing LASIK [and] assisting him with LASIK," though he bemoaned the fact that, during such procedures, he and Lyons "d[id]n't talk about anything except that patient at hand." Standing shoulder to shoulder with another medical professional, assisting him with a surgical procedure, and discussing the patient at hand are all forms of collaboration. *See Collaborate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/%20collaborate (last visited July 15, 2024) (defining collaborate as, among other things, "to work jointly with others or together especially

in an intellectual endeavor"). If other forms of collaboration are vital to the treatment of these surgical patients, Ryne did not identify them.

The only example that Ryne points to on appeal to show the alleged absence of collaborative care is his own failure to collaborate with Holdridge.[32] But while Ryne testified that he and Holdridge had collaborated in the past, he did not claim that effective patient care required collaborating with Holdridge in particular, as opposed to collaborating with another doctor. More to the point, the trial court's dissolution findings relied on Lyons's actions rather than on those of Holdridge. And such reliance was logical not only because one of the statutory dissolution grounds is expressly limited to the conduct of "another owner," Tex. Bus. Orgs. Code Ann. § 11.314(2), but also because Holdridge was an employee under Ryne's authority. Ryne confirmed that he was one of Holdridge's bosses, and while he stated that he was "not intimately involved in" the hiring decisions, there was no evidence that he lacked the authority to fire an employee if he believed that the employee's behavior was jeopardizing patient care or the Eyecare Partnership as a whole.

Similarly, while Ryne broadly insists that Lyons's and Holdridge's "unprofessionalism raises legitimate patient safety concerns," neither he nor any other witness testified to any subpar patient care. To the contrary, Ryne and Lyons both

---

[32]At trial, Lyons confirmed that "[t]he only collaborative care that [wa]s not taking place at th[at] point [wa]s between Dr. Ryne and Dr. Holdridge."

confirmed that, despite the ongoing litigation and soured relationships, there had been no adverse patient outcomes.[33] *See Shannon Med. Ctr. v. Triad Holdings III, L.L.C.*, 601 S.W.3d 904, 917 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (noting that "a partnership can carry on its business in accordance with its governing documents despite litigation between partners" and emphasizing that "the [p]artnership [in that case] ha[d] done so").

Ryne also claims that Lyons engaged in "unilateral decision-making" by, for example, implementing an objectionable office policy regarding the acceptance of new patients. But he offered no evidence that such administrative disagreements led to a deadlock or prevented the continuation of the Eyecare Partnership.[34] *Cf. id.* at 916–17 (holding evidence of alleged voting deadlock did not conclusively establish reasonable impracticability of carrying on business in conformity with governing documents when partnership agreement provided method for breaking deadlock). In fact, Ryne's testimony indicated to the contrary: he admitted at trial that nothing was preventing

---

[33]Ryne initially testified that patient care had suffered due to the disputes at the practice because there was "no collaborative care anymore," but he later reversed course and insisted that he "didn't say patient[] outcomes [we]re less desirable." He confirmed that there had been no negative patient outcomes to date but opined that the Eyecare Partnership was "set[ting] [it]self up for bad things that happen when the doctors don't communicate."

[34]Ryne did not seek resolution of the administrative disagreements as part of the underlying litigation, so it is unclear if such disputes remain live.

the Eyecare Partnership from continuing to operate and that the business was profitable.

This case thus stands in stark contrast to the "extreme" instances in which judicial dissolution has been affirmed. *See Patton*, 279 S.W.2d at 856–57. In *Dunnagan v. Watson*, for example, the limited partnership at issue was formed to manage and operate a horse racing facility, and two of the partners—Lawley and Watson—decided to open a restaurant and provide certain "backside" racetrack services on the premises while the facility was awaiting its racing license. 204 S.W.3d at 35–36. But, ultimately, the facility's racing license was denied, and a jury found that it was impracticable for the partnership to continue. *Id.* at 36–37, 42–44. We affirmed, noting that the third partner—Dunnagan—had refused to make any more contributions to the partnership, that he had opposed the restaurant and backside operations from the start, and that "the ends of the limited partnership ha[d] been frustrated not only by the failure of the limited partnership to obtain a racing license and operate a horse racing track, which was the 'purpose' of the limited partnership, but by the seemingly endless disagreements and discontent." *Id.* at 42–44 (applying similar provision in predecessor statute).

Ryne analogizes this case to *Dunnagan*, but the comparison does not help him. Unlike in *Dunnagan*, nothing prevents the Eyecare Partnership from continuing to fulfill its purposes. There is no evidence that the Eyecare Partnership lacks the governmental licenses required for the provision of vision treatment services, and there is no evidence that Lyons has refused to make necessary contributions to the practice. "Toxic"

42

workplaces are no doubt unpleasant, but they do not warrant the extraordinarily harsh remedy of judicial dissolution. *See Nerium SkinCare*, 2018 WL 2323243, at *7 (recognizing that "[S]ection 11.314 requires more than just a disagreement between owners" and holding "strained relationship" did not conclusively establish grounds for dissolution when owners disagreed regarding scope of products sold by company).

Given Texas's longstanding commitment to the promotion of economic development and the freedom of contract, courts are loath to shut down profitable, contract-governed businesses by judicial fiat. The Legislature has provided limited grounds on which such involuntary dissolution is permitted, and here, there is no evidence to satisfy any of the grounds relied upon. *See* Tex. Bus. Orgs. Code Ann. § 11.314. The evidence was legally insufficient to support the trial court's dissolution of the Eyecare Partnership; we therefore sustain Lyons and Holdridge's challenge to the dissolution order.

## F.     Remaining Issues

We need not address Lyons and Holdridge's remaining issues. *See* Tex. R. App. P. 47.1. Although they assert that the Newberry Offer was a sham, because we disposed of Ryne's breach of fiduciary duty, breach of contract, and tortious interference claims on sufficiency grounds, the "bona fide" nature of the Newberry Offer is moot. The same is true of their two challenges to the fraud and malice findings underlying the trial court's awards of exemplary damages. The exemplary damage awards were premised

on Ryne's fiduciary duty and tortious interference claims, so our reversal of those claims undermines the exemplary damages as well.

In their final appellate issue, Lyons and Holdridge contend that the trial court erred by awarding Ryne conditional appellate fees rather than awarding such fees to whichever party prevailed on appeal. But the attorney's fees were awarded for Ryne's declaratory judgment causes of action, and we have overruled Lyons and Holdridge's challenges to those causes of action. Their challenge to the fee award is thus moot because Ryne has prevailed on the relevant claim on appeal.

## III. Conclusion

The trial court properly construed the Holdridge Agreement by giving the phrase "the Partnership Fair Market Value" its ordinary meaning, but there was insufficient evidence to support its judgment on the breach of fiduciary duty, breach of contract, and tortious interference causes of action. Moreover, the dissolution order cannot stand. We therefore

- affirm the declaratory judgments interpreting the Holdridge Agreement;

- reverse the breach of fiduciary duty judgments and corresponding awards of compensatory and exemplary damages entered against Robert A. Lyons, P.A. and render judgment that Wallace Ryne, O.D., P.C. take nothing on those claims;

- reverse the breach of contract judgment entered against Robert A. Lyons, P.A. and render judgment that Wallace Ryne, O.D., P.C. take nothing on that claim;

- reverse the tortious interference judgments and corresponding awards of compensatory and exemplary damages entered against Kasey Holdridge and render judgment that Wallace Ryne, O.D., P.C. take nothing on those claims;

- reverse the trial court's order of dissolution; and

- affirm the trial court's award of attorney's fees.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  July 18, 2024